## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

May 23 2016, 9:00 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Cynthia Phillips Smith
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Abigail R. Recker
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Termination of the Parent-Child Relationship of: J.P. and C.P., Minor Children,<br><br>and,<br><br>C.T., Mother,<br><br>*Appellant-Respondent,*<br><br>v. | May 23, 2016<br><br>Court of Appeals Cause No. 79A02-1510-JT-1751<br><br>Appeal from the Tippecanoe Superior Court<br><br>The Honorable Faith Graham, Judge<br><br>Trial Court Cause No. 79D03-1504-JT-29 79D03-1504-JT-30 |

Indiana Department of Child
Services,

*Appellee-Petitioner*.

**Barnes, Judge.**

# Case Summary

C.A.H.T. ("Mother") appeals the termination of her parental rights to J.P. and
C.P. We affirm.

# Issue

Mother contends the evidence was not sufficient to support the termination of
her parental rights.

# Facts

J.P. was born on May 13, 2010, and C.P. was born on January 17, 2012. Both
are the children of Mother and Jo.P. ("Father")[1]. In January 2014, the
Department of Child Services ("DCS") filed a petition alleging J.P. and C.P.
were children in need of services ("CHINS"). DCS alleged Mother's house,

---

[1] Father's parental rights were also terminated, but he did not appeal.

where the children lived, was dirty, had animal and human feces on the floor and ceiling, and smelled strongly of feces. DCS further alleged Mother's boyfriend physically abused J.P. and that Mother "spoke very negatively about her children," calling them a "pain in the a**" and stating that they "annoy the h*** out of her." DCS ex. 2, p. 4.

[4] In February 2014, Mother admitted the children were CHINS, and the trial court placed them in the care of relatives. The trial court found:

> Mother admits struggling as a single parent to manage the children's behaviors, maintain the home, and provide the necessary supervision . . . [J.P.], age 3, has been diagnosed with ADD and throws his feces throughout the home for an unknown reason.

> Mother had been involved in relationships strife [sic] with domestic violence and chaos . . . .

> * * * * *

> There is an extensive history of DCS investigations into the family between March 2012 and January 2014 to include the following: one (1) assessment regarding concerns with Mother's mental health and past thoughts of harming herself, three (3) assessments regarding physical abuse and domestic violence, two (2) assessments as to lack of supervision, two (2) assessments regarding mother being verbally abusive to the children and the poor conditions of the home, two (2) assessments regarding sexual abuse, and the most recent assessment involving Mother's boyfriend abusing the children. Neglect was substantiated (Lack of Supervision) on 06/10/2013. [J.P.]'s ability to exit the home without Mother's knowledge has been an on-going issue.

* * * * *

> There is also an extensive history regarding Law Enforcement being called to Mother's home and Father's home regarding concerns of supervision, physical abuse, domestic violence, harassment, and the conditions of Mother's home.

DCS Ex. 1, p. 47.

[5] In April 2015, DCS filed petitions to terminate Mother's and Father's parental rights to J.P. and C.P. The trial court held an evidentiary hearing in June 2015. On September 16, 2015, the trial court entered findings of fact and conclusions thereon in an order terminating Mother's and Father's parental rights.

## Analysis

[6] The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *Bester v. Lake County Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005) (citing *Pierce v. Soc'y of Sisters,* 268 U.S. 510, 534–535, 45 S. Ct. 571, 573 (1925), and *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S. Ct. 625, 626-27 (1923)). "A parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" *Id.* (quoting *Troxel v. Granville,* 530 U.S. 57, 65, 120 S. Ct. 2054, 206 (2000)). "It is cardinal with us that the custody, care and nurture of the child reside first in the parents . . . ." *Troxel*, 530 U.S. at 65, 120 S. Ct. at 2060 (citing *Prince v. Massachusetts,* 321 U.S. 158, 166, 64 S. Ct. 438, 442 (1944)). Parental interests, however, are not absolute

and must be subordinated to the children's interests in determining the proper disposition of a petition to terminate parental rights. *Bester*, 839 N.E.2d at 147. "[P]arental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities." *Id.* (quoting *In re D.D.,* 804 N.E.2d 258, 265 (Ind. Ct. App. 2004)).

[7] Pursuant to Indiana Code Section 31-35-2-4-(b)(2), when DCS seeks to terminate the parent-child relationship of children who have been adjudicated CHINS, it must allege, in part:

> (B) that one (1) of the following is true:
>
> > (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> >
> > (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
> >
> > (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

DCS must prove its allegations by clear and convincing evidence. *Egly v. Blackford County Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1234 (Ind. 1992).

[8] Our supreme court recently cautioned:

> [T]he "clear and convincing" evaluation is to be applied judiciously. "Reviewing whether the evidence 'clearly and convincingly' supports the findings, or the findings 'clearly and convincingly' support the judgment, is not a license to reweigh the evidence. Rather, it is akin to the 'reasonable doubt' standard's function in criminal sufficiency of the evidence appeals—in which we do not reweigh the evidence or assess the credibility of the witnesses, and consider only whether there is probative evidence from which a *reasonable jury could have* found the defendant guilty beyond a reasonable doubt . . . . Our review must give due regard to the trial court's opportunity to judge the credibility of the witnesses firsthand, and not set aside [its] findings or judgment unless clearly erroneous."

[9] *In re N.G.* -- N.E.3d --, No. 02S04-1604-JT-207, slip op. at 2 (Ind. Apr. 26, 2016) (quoting *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014)) (alterations in *N.G.*) (emphasis in *E.M.*) (citations omitted) (quotations omitted).

[10] Mother does not challenge any of the trial court's findings of fact. An appellant who does not cogently argue that the trial court's findings were not supported by sufficient evidence waives that argument on review and merely contends that the facts found by the trial court are insufficient, as a matter of law, to support a judgment. *See City of Whiting v. City of East Chicago*, 359 N.E.2d 536, 540, 266 Ind. 12, 19 (1977). "[W]here a party challenges only the judgment as contrary to law and does not challenge the special findings as unsupported by the

evidence, we do not look to the evidence but only to the findings to determine whether they support the judgment." *Smith v. Miller Builders, Inc.*, 741 N.E.2d 731, 734 (Ind. Ct. App. 2000) (alteration in original).

[11] The trial court concluded: 1) There is a reasonable probability that the conditions that resulted in the removal of the children and the reasons for the continued placement outside the home will not be remedied; 2) continuation of the parent-child relationship poses a threat to the well-being of the children; 3) DCS has a satisfactory plan of adoption; and 4) it is in J.P.'s and C.P.'s best interests to terminate Mother's parental rights.

### I. *The Conditions Resulting in Removal Will Not Be Remedied*

[12] Mother first claims DCS did not demonstrate by clear and convincing evidence that there is a reasonable probability the conditions resulting in the children's removal will not be remedied or that the continuation of the parent-child relationship poses a threat to the children's well-being. Because Indiana Code Section 31-35-2-4(b)(2)(B) is written in the disjunctive, DCS needed to prove only one of the requirements of subsection (B). We find Indiana Code Section 31-35-2-4(b)(2)(B)(i)—that there is a reasonable probability that the conditions that resulted in the children's removal or the reasons for placement outside the home of the parents will not be remedied—dispositive in this case and do not address subsection (B)(ii).

[13] Consideration of whether the conditions will be remedied requires judging the parent's fitness at the time of the termination hearing, "taking into

consideration evidence of changed conditions." *K.E. v. Indiana Dep't of Child Servs.*, 39 N.E.3d 641, 647 (Ind. 2015).

> Changed conditions are balanced against habitual patterns of conduct to determine whether there is a substantial probability of future neglect. Habitual conduct may include criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment, but the services offered to the parent and the parent's response to those services can also be evidence demonstrating that conditions will be remedied.

*Id.* (internal quotations omitted) (citations omitted).

[14] The following is a summary of the trial court's unchallenged findings of fact with regard to this element of the statute. At the outset of this matter, Mother's home was "somewhat dirty," smelled of feces, and DCS observed feces on the ceiling and dried vomit on the floor of the children's room. App. p. 8. Mother spoke negatively about the children. Mother allowed a boyfriend to babysit the children even after she called the police because he "snapped on her kids." *Id.* DCS received a report that the same boyfriend physically abused J.P. DCS offered Mother a number of services including parenting and mental health assessments, individual therapy, case management, and supervised parenting time. Mother had a pattern of involvement in abusive relationships.

[15] The trial court found that, during the life of this case, Mother introduced DCS to at least five men she identified as a boyfriend or fiancé, and at least two of those relationships were violent. On the date of the termination hearing,

Mother informed DCS for the first time that she had recently gotten married. Mother was unemployed at the time of the trial, and she was only sporadically employed through the duration of this case. At the time of trial, Mother and her husband were living with friends because her lease had been terminated. Mother participated in individual therapy, but "little progress has been made in addressing Mother's instability, relationships, and parenting." *Id.* at 9. Mother did not acknowledge her lack of parenting skills and that deficit's impact on the children. "Psychological testing indicates Mother's ability to relate to her children in a nurturing and emotionally consistent manner is limited . . . Mother's inconsistent interactions with the children result in extreme behavioral struggles . . . ." *Id.* Mother denied the substantiated episodes of inappropriate sexual touching between herself and both J.P. and C.P.

[16] The evidence reveals Mother began individual therapy through the Wabash Valley Alliance in May 2014. In the therapy progress report for June 2014, Mother's therapist noted: "Client has made no notable progress on goals due to limited commitment and presentation to therapy . . . Client minimized issues and struggles with DCS involvement, and identified resistance to treatment." DCS Ex. 8, p. 14. Mother missed one therapy appointment in August 2014 and failed to attend any appointments in July, September, or October 2014. Melissa Ruffino, mother's individual therapist at the time of the trial, testified that she only learned about a week earlier that Mother had gotten married. Ruffino stated, "I don't think I ever really heard of him before that." Tr. p. 90. Mother herself testified she agreed that she has "struggled some in [her] life making

good choices with men" and that in the last year she had been involved in "a couple" of physically-abusive relationships. *Id.* at 77-79. Mother further testified she was not working with her therapist to address those issues.

[17] Brian Nichols was the most recent DCS family case manager assigned to J.P. and C.P.'s CHINS case. Since Nichols began working with the family in May 2014, there were at least five men who Mother introduced to him as her boyfriend or fiancé. Prior to the fact-finding hearing, Mother had not told Nichols she intended to marry, and she did not ask DCS to perform a background check so her new husband could be around the children. Nichols testified Mother had not "adhere[d] to the guidance [from DCS] to be prudent and to minimize the number of relationships and the people in and out of her home, etcetera[.]" *Id.* at 122-23.

[18] Mother testified she was unemployed at the outset of this case and at the time of trial. She did not have steady employment during the pendency of the case. With regard to the substantiated allegations of sexual abuse by Mother, Nichols testified that Mother was "[a]damantly in denial that it occurred." *Id.* at 131. Mother did not participate in any services targeted at the substantiated allegations of sexual abuse. *Id.* at 132-33.

[19] After the children were removed in February 2014, Mother's visits with them were partially supervised by Bauer Family Resources. In March 2014, the caseworker's monthly progress report notes that, when a Bauer homemaker attempted to drop in on one of Mother's visits with the children, no one

answered the door. Mother had taken the children to McDonald's, but she failed to let anyone know about the outing and had not provided DCS with her license and insurance information. When someone from DCS arrived at Mother's house to address the situation, he and Mother argued, and the case manager cancelled the visit and called the police. In July 2014, Mother responded to a display of disobedience by J.P. by saying to him, "You're lucky I can't hit you or I'd beat your a\*\*. I don't even want to see you now." DCS Ex. 9, p. 60. In December 2014, Mother's visits with the children were moved to a therapeutic setting because the "HBFS witnessed [Mother] smack [J.P] across the face." *Id.* at 15. During the month of March 2015, Mother did not have any visits with the children. At the time of the termination hearing, Mother visited with the children for an hour once each week.

[20] We conclude this evidence establishes clear patterns of Mother's poor decision making with regard to intimate relationships, her inability to maintain stable employment and housing, and her inability to appropriately manage the children's behaviors. *See K.E.*, 39 N.E.3d at 647. This evidence of habitual conduct is sufficient to conclude there is a substantial probability of future neglect. *See id.* The trial court's conclusion that there was a reasonable probability that the conditions resulting in removal will not be remedied was not clearly erroneous.

## II. Best Interests

[21] Mother next contends DCS did not demonstrate by clear and convincing evidence that termination of the parent-child relationship is in the children's

best interest. In determining what is in the best interests of the children, the trial court is required to look at the totality of the evidence. *D.D.*, 804 N.E.2d 258, 267 (Ind. Ct. App. 2004), *trans. denied*. In doing so, the trial court must subordinate the interests of the parents to those of the children involved. *Id.*

[22] The trial court found the children had been in six placements since they were removed from Mother. "The children are calmer since placement in foster care where they are provided with guidance and stability." App. p. 10. Mother did not have the ability to meet the children's long-term needs. "It is not safe for the children to be in the care of either parent." *Id.* Finally, the trial court found, "[t]he children are adoptable even if not with concurrent [sic] foster parents." *Id.*

[23] J.P. was referred to the Wabash Valley Alliance for individual counseling as a result of outbursts and difficulty controlling his anger, difficulty following directions, tantrums, and self-harming behaviors, including banging his head on the floor. One of J.P.'s foster parents also reported incidents of "sexual acting out." Tr. p. 99. J.P. has been diagnosed with attention deficit disorder and oppositional defiant disorder and has been prescribed Risperdal and Clonidine. According to Kristine Butler, J.P.'s therapist, J.P. "would require a bit more than an average child as far as parenting goes." *Id.* at 110.

[24] Butler testified that, although she did not see large changes in J.P.'s behavior in the time she worked with him, "[h]e was easier to de-escalate at certain points near the end of my therapy with him. So when he would have outbursts he was

easier to talk down because we had talked about coping skills and de-escalation." *Id.* at 103. Butler further testified, "It seemed to me that visits did have a large impact on his behaviors and his sense of security," and she recommended suspending J.P.'s visits with Mother until Mother sought treatment focused on sexual offenses. *Id.* at 104. First Steps diagnosed C.P. with a speech delay, but in January 2015, DCS's progress report states, "[C.P.] has made great progress with her speech, to the degree that First Steps has dismissed her. She is developmentally on target." DCS Ex. 3, p. 19.

### III. Satisfactory Plan

[25] Finally, Mother argues that the trial court's conclusion that there is a satisfactory plan for the care and treatment of the children is clearly erroneous. In order for the trial court to terminate the parent-child relationship the trial court must find that there is a satisfactory plan for the care and treatment of the child. *D.D.*, 804 N.E.2d at 268. This plan does not need to be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated. *Id.*

[26] DCS's plan for J.P. and C.P. is adoption, and "[t]he foster home in which they are currently in is interested in being considered as a pre-adoptive home." Tr. p. 139. In light of this evidence, we further conclude that the trial court did not commit clear error when it concluded that termination is in the children's best interests and that DCS has a satisfactory plan for the children.

# Conclusion

[27] The trial court's termination of Mother's parental rights of J.P. and C.P. is not clearly erroneous. We affirm.

[28] Affirmed.

Vaidik, C.J., and Mathias, J., concur.