

ATTORNEY FOR APPELLANT

Amanda McIlwain
Legal Aid Corporation of
Tippecanoe County
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of:

A.B. (Minor Child),

and

C.B. (Mother),

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner*

June 21, 2019

Court of Appeals Case No.
18A-JT-3110

Appeal from the Tippecanoe
Superior Court

The Honorable Faith A. Graham,
Judge
The Honorable Tricia L.
Thompson, Magistrate

Trial Court Cause No.
79D03-1804-JT-48

**Baker, Judge.**

[1] C.B. (Mother) appeals the trial court's order terminating her parent-child relationship with her child, A.B. (Child). Mother argues that there is insufficient evidence supporting the trial court's conclusion that the conditions resulting in the placement of Child outside Mother's custody will not be remedied, that the continuation of the parent-child relationship poses a threat to Child's well-being, and that the termination of the parent-child relationship is in the child's best interest. Finding the evidence insufficient, we reverse and remand for further proceedings.

## Facts

[2] Child was born in January 2011 to Mother and B.B. (Father).[1] On April 18, 2017, the Department of Child Services (DCS) and law enforcement officers went to Mother's home after receiving a report that Child's half-brother (Sibling), who was then three years old, had been neglected due to lack of supervision by Mother. When they arrived, Sibling was walking down the street unsupervised; Mother was inside, passed out on the couch with burnt spice cigarettes near her and within a child's reach. The officers tried several times to wake Mother. Once they did, they arrested her, and DCS placed Child and Sibling in relative care. The State charged Mother with Level 6 felony

---

[1] Father is not a party to this appeal.

neglect of a dependent and Class A misdemeanor possession of a synthetic drug or lookalike substance. Mother remained incarcerated until April 22, 2017.

[3] On April 19, 2017, DCS filed a petition alleging both children to be children in need of services (CHINS) based on the above facts.[2] On May 15, 2017, a factfinding hearing took place, after which the juvenile court adjudicated Child to be a CHINS. On May 25, 2017, the juvenile court entered its dispositional and parental participation decrees, ordering Mother to participate in parenting time, a substance abuse assessment and all recommendations, case management, a parenting assessment and all recommendations, random drug screens, a mental health evaluation and all recommendations, individual counseling and all recommendations, and family therapy and all recommendations.

*Mother's Participation with Services and Visits*

[4] In May 2017, DCS referred Mother to Bauer Family Resources for parenting time and case management. In May and June 2017, Mother participated in case management and her parenting visits were positive, with Mother providing appropriate care for the children and no safety concerns reported. Mother then missed multiple visits in July and August 2017. Mother reported that she was

---

[2] Sibling's father ultimately took custody of him. Sibling is not part of this appeal.

depressed and that her depression was why she disengaged with visitation. Because Mother missed visits, in August 2017, Bauer closed its services to her.

[5] In May 2017, DCS referred Mother to Wabash Valley Alliance (WVA) for a mental health evaluation, which Mother completed. WVA also recommended that Mother participate in individual therapy and family therapy.

[6] On June 13, 2017, Mother completed an intake assessment with an addictions counselor at WVA. Mother told the counselor that she had used alcohol in the past but that she had never used illegal drugs. Following the assessment, the counselor recommended that Mother complete a substance abuse assessment and participate in individual counseling for her symptoms of depression.

[7] On July 31, 2017, Mother completed her substance abuse assessment at WVA. During the assessment, Mother indicated that she was using alcohol, methamphetamine, and opiates, and that she had used methamphetamine three days before the assessment. The treatment provider recommended that Mother attend an intensive outpatient program (IOP). On September 5, 2017, Mother attended one IOP session at WVA; she was later discharged for noncompliance. In October 2017, DCS referred Mother to Bauer for another IOP, which Mother did not complete. On August 22, 2017, Mother requested a medication evaluation; it is unclear from the record whether she received a referral for it.

[8] On August 30, 2017, the juvenile court stated that Mother's parenting time may continue so long as she submitted to all requested drug screens and refrained from using or testing positive for methamphetamine, but that if she tested

positive, her parenting time would be immediately suspended and would not resume until further order of the juvenile court. After Mother tested positive for methamphetamine on September 28, 2017, the juvenile court suspended her parenting time. Family Case Manager (FCM) Samantha Goltz testified that Mother "was given the opportunity to participate in I believe 30 days of clean screens and not be missing any screens" but that Mother did not comply with those terms and has not been allowed to visit Child since then. Tr. Vol. II p. 77.

[9] Mother requested that visitation be reinstated. Mother testified that in October 2017, she requested a Skype or telephone visit if she could not have an in-person visit due to her failing the drug screen. DCS denied her request, believing it would be detrimental to Child. In February 2018, DCS denied Mother's request because Mother did not participate in drug screens and had not seen Child in a long time. In June 2018, DCS denied Mother visitation because of the length of time that had passed since Mother's last visit with Child. DCS never reinstated visits during these proceedings.

[10] In November 2017, DCS referred Mother to case management at Lifeline Youth and Family Services; Lifeline later discharged her due to lack of contact. However, Mother was incarcerated from November 6 through December 16, 2017, for contempt of court because she failed to pay child support for another child. She was then on work release until January 5, 2018.

[11] FCM Goltz made a referral for a psychological evaluation on March 5, 2018, and although Mother was incarcerated again on March 26, 2018, FCM Goltz

did not renew the referral because she did not know when Mother would be released. Mother's incarceration, which was for the neglect of a dependent charge (to which Mother had pleaded guilty) that led to this case, lasted through May 23, 2018. Following her arrest, she was on house arrest through August 1, 2018. Mother was on probation at the time of the termination hearing.

[12] At the start of these proceedings, Mother was seeking housing because her residence at the time was being investigated for mold. She testified that she had been living in the same place since November 2017, and at the time of the termination hearing, she was facing eviction because the property owners sold the building. She testified that she was actively looking for housing, and that if she needed to, she could stay with her father or her boyfriend's mother. As for employment, at the time of the termination hearing, Mother was in her second month of employment at Steak 'n' Shake; she had previously worked for a cleaning company. Mother was also taking prescribed medication to treat her depression and was working to obtain health insurance.

### Mother's Drug Use and Screens

[13] DCS referred Mother for drug screens. Mother missed twenty-two screens between August 22, 2017, and October 10, 2017. Mother completed eleven screens from September 27, 2017, to November 1, 2017, that were negative of all substances. On October 13 and 26, 2017, she tested positive for alcohol. On September 28, 2017, Mother tested positive for methamphetamine.

[14]     In the three months leading up to the termination hearing, Mother consistently participated in drug screens, all of which were clean, and she was still participating at the time of the hearing.[3]  FCM Goltz testified that because Mother had been incarcerated before the three months in which she consistently tested clean, Mother could have been clean for approximately five months. Mother testified that, at the termination hearing, she was five days shy of five months of sobriety.

### Child

[15]     When this case began, Mother and Child had a bond.  Court Appointed Special Advocate (CASA) Suzanne Wetzel testified that in June 2017, Mother was "loving" and "attentive" toward Child.  Tr. Vol. II p. 46.  Child has some developmental delays that involve irregular social behaviors, including toilet training delays.  She has been diagnosed with Attention-Deficit Hyperactivity Disorder and impulse-control disorder.  On May 26, 2017, Child completed an intake appointment with a therapist who recommended that Child participate in case management and medication management to address Child's behaviors and in individual therapy to work on coping skills and establishing boundaries.

[16]     Between September 11 and 22, 2017, Child participated in case management. Child struggled to comply with directions, had difficulty transitioning between

---

[3] From May 23 through August 1, 2018, Mother submitted to approximately seven drug screens for her criminal case.  It is unclear whether she was also screening through DCS.

activities, and became fearful when it was time to use the restroom. The treatment provider was concerned that Child may have suffered from trauma that resulted in her fear of using the restroom. CASA Wetzel testified that Child has made significant progress both at home and at school and is now able to be attentive and stay focused. Her toilet training has improved. Child was taking medication for her ADHD and aggression.

[17] Since being removed from Mother's care, Child has been placed in four foster homes and with two relative caregivers. At the time of the termination hearing, Child was in relative placement in Florida; she was doing well in that placement, and her caregivers were willing to adopt her.

### Termination Proceedings

[18] On April 4, 2018, DCS filed a petition to terminate the parent-child relationship between Mother and Child. DCS stopped funding services for Mother in June 2018 because Mother was not participating in services. A factfinding hearing took place on June 27 and August 22, 2018. During the hearing, FCM Goltz testified that termination was in Child's best interest because Child is in a stable and loving environment and is doing well. CASA Wetzel also recommended termination based on Mother's failure to comply with services and her lack of participation in Child's life; she also testified that termination was in Child's best interest because Child is thriving in her current placement and that disruption would be detrimental to her.

On November 21, 2018, the juvenile court entered an order terminating the relationship. Mother now appeals.

# Discussion and Decision

## I. Standard of Review

Our standard of review with respect to termination of parental rights proceedings is well established. In considering whether termination was appropriate, we neither reweigh the evidence nor assess witness credibility. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1229 (Ind. 2013). We will consider only the evidence and reasonable inferences that may be drawn therefrom in support of the judgment, giving due regard to the trial court's opportunity to judge witness credibility firsthand. *Id.* Where, as here, the trial court entered findings of fact and conclusions of law, we will not set aside the findings or judgment unless clearly erroneous. *Id.* In making that determination, we must consider whether the evidence clearly and convincingly supports the findings, and the findings clearly and convincingly support the judgment. *Id.* at 1229-30. It is "sufficient to show by clear and convincing evidence that the child's emotional and physical development are threatened by the respondent parent's custody." *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 148 (Ind. 2005).

Indiana Code section 31-35-2-4(b)(2) requires that a petition to terminate parental rights for a CHINS must make the following allegations:

(A) that one (1) of the following is true:

(i) The child has been removed from the parent for at least six (6) months under a dispositional decree.

(ii) A court has entered a finding under IC 31–34–21–5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

(iii) The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of
the child.

DCS must prove the alleged circumstances by clear and convincing evidence.
*K.T.K.*, 989 N.E.2d at 1230.

# II. Drug Screens

[22] Initially, we address an issue raised by neither of the parties. The trial court's order included this finding of fact:

> 15. Mother tested positive for methamphetamine on July 17, 2017, July 31, 2017, and September 28, 2017. Mother tested positive for alcohol on two (2) drug screens in October 2017. Mother failed to submit to numerous drug screens as requested.

Appealed Order p. 3. DCS submitted evidence regarding Mother's drug screens through an exhibit, which included affidavits from a "Certifying Scientist and Custodian of Records" for a toxicology laboratory and a "custodian of the records" for another laboratory and Mother's drug screen results. Appellee's Ex. Vol. III p. 4-49. DCS did not elicit expert testimony regarding these drug screens during the termination hearing.

[23] As we have recently stated, exhibits containing drug test results do not fall under the business records exception to the rule against hearsay and, although

Mother did not make a hearsay objection,[4] the exhibit should have been inadmissible as hearsay. *See Matter of L.S.*, — N.E.3d — at *4 (Ind. Ct. App. May 21, 2019). Admission of this evidence requires expert testimony and the opportunity for cross-examination. Accordingly, the trial court erred by admitting the exhibit into evidence and by relying on them in its order.

## III. Remedy of Conditions

[24] Mother first argues that DCS did not prove by clear and convincing evidence that there is a reasonable probability that the conditions resulting in Child's removal will not be remedied. Child was initially removed from Mother because of concerns of neglect and substance abuse.

[25] When this case began, Mother "was wanting to work on getting her relationship back with [Child] and being – and getting life back." Tr. Vol. II p. 42. Child's therapist testified that "for all intents and purposes at that time [Mother] had good intentions." *Id.* CASA Wetzel testified that in June 2017, Mother was "loving" and "attentive" toward Child. *Id.* at 46.

[26] Although Mother suffered a relapse with her drug use and was twice incarcerated during these proceedings, by the time of the termination hearing, Mother had completed a mental health assessment, a substance use assessment,

---

[4] Mother objected to the admission of this exhibit because the exhibit did not include all of Mother's screens throughout the proceedings, but instead included screens only through June 2018. We admonish DCS to be thorough in its submission of evidence.

and, during her incarceration, a psychological evaluation. She also had complied with her criminal case. By the time of the termination hearing, Mother had maintained sobriety for at least three months, if not longer. She also had stable employment for two months, had applied for health insurance, and had addressed her mental health needs by visiting her doctor and starting medication. Although the State argues that Mother likely will be unable to maintain her sobriety long-term without treatment, Mother has maintained her sobriety even after DCS stopped funding services in June 2018.

[27] Moreover, Mother missed some of her services because she was incarcerated. Specifically, in November 2017, DCS referred Mother to case management at Lifeline; Lifeline later discharged her due to lack of contact. However, Mother was incarcerated from November 6 through December 16, 2017, for contempt of court because she failed to pay child support for another child. Similarly, when Mother did not complete the psychological evaluation that FCM Goltz referred for her because of her incarceration, FCM Goltz did not renew the referral because she did not know when Mother would be released. It is well established that incarceration is an insufficient basis for terminating parental rights, *K.E. v. Indiana Dep't of Child Servs.*, 39 N.E.3d 641, 643 (Ind. 2015), and we decline to hold against Mother her inability to participate in referred services because she was incarcerated.

[28] As for Mother's living environment, Mother testified that she has been living in the same place since November 2017, her incarcerations notwithstanding. At the time of the termination hearing, she was facing eviction because the

property owners sold the building. She testified that she was actively looking for housing, and that if she needed to, she could stay with her father or her boyfriend's mother. We find no evidence in the record to contravene Mother's testimony that she has had or will have appropriate housing. Indeed, neither FCM Goltz nor CASA Wetzel had visited Mother's residence.

[29] Under these circumstances, there is not clear and convincing evidence supporting the trial court's conclusion that there is a reasonable probability that the reasons for Child's placement outside of Mother's care and custody will not be remedied.

## IV. Child's Well-Being

[30] Because the statute is phrased in the disjunctive, we must also consider whether DCS established by clear and convincing evidence that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to Child's well-being.

[31] The trial court did not cite any specific facts to support its conclusion that the continuation of the parent-child relationship posed a threat to Child's well-being. The trial court simply stated that the "child needs stability in life. The child needs parents with whom the child can form a permanent and lasting bond and who will provide for the child's emotional, psychological, and physical well-being. The child's well-being would be threatened by keeping the child in parent-child relationships with Mother . . . ." Appealed Order p. 4.

[32]    At the start of this case, Mother and Child were bonded. A Bauer report from July 2017 noted that Mother "has a bond with [Child] and [Sibling]; as evidence by her interactions with [Sibling] and [Child] during parenting time and how [Sibling] and [Child] run and hug [Mother] upon seeing her during parenting time." Appellee's Ex. Vol. II p. 68. That same report indicated that Mother appropriately engaged with and took care of the children.

[33]    The State contends that Mother failed to complete the actions necessary to resume visitation with Child. It is accurate that Mother was advised that if she continued to test positive for methamphetamine, her visits with Child would be suspended; after Mother tested positive and the juvenile court suspended her visits, the juvenile court provided that Mother would be able to resume visits if she submitted clean drug screens for thirty days, but Mother failed to do so.

[34]    Yet the record is clear that Mother wanted another chance so she could maintain her bond with Child—and DCS refused to give Mother this chance. DCS justified its decision in part by arguing that the visits would be traumatic to Child based on the length of time that had passed since Child had last seen Mother. Yet Mother was unable to rectify that potential issue because DCS denied her any additional visitation. Moreover, DCS did not explain why the passage of time between visits would make another visit traumatic for Child. Considering that Child was placed in six different homes throughout these proceedings, we find DCS's reasoning puzzling. Indeed, it is hard to understand how seeing a parent with whom she has a bond could be more traumatic than bouncing from placement to placement. To terminate a parent-

child relationship based on the circular logic that DCS employed in this case regarding visitation is not a result that we can sanction.

[35] In short, the record does not hold clear and convincing evidence of a reasonable probability that the continuation of the parent-child relationship poses a threat to Child's well-being.

## V. Child's Best Interests

[36] Finally, we consider the general question of what is in Child's best interests. Stability and consistency are important for every child. Throughout these proceedings, Mother has made noteworthy improvements with her sobriety and personal stability. Mother and Child had a bond when this case began. Mother has exerted herself to remedy her situation and become a better caregiver. Mother wants to have a relationship with Child and wants to parent Child.

[37] CASA Wetzel testified that she believed that termination was in Child's best interest because Child was thriving in her current placement and the disruption would be "extremely detrimental to her." Tr. Vol. II p. 48. It seems, then, that DCS recommended termination based on the grounds that Child needs stability and would be harmed by yet another placement. Yet the record is devoid of evidence that Child would be affected if termination were delayed to give Mother an opportunity to maintain her sobriety, participate in services, and resume visitation with Child, nor is there evidence that Child's current caregivers' willingness to adopt her would be affected by putting off termination.

[38] We acknowledge that Mother must continue to build a stable, sober life, participate in services, and preserve her bond with Child. Yet, based on the record, we simply cannot say that clear and convincing evidence exists that, at this point, the termination of this relationship is in Child's best interests.[5]

[39] The judgment of the trial court is reversed and remanded for further proceedings.

Najam, J., and Robb, J., concur.

---

[5] Mother also argues that DCS violated her due process rights by filing a petition to terminate her parental rights despite not providing appropriate services. Because we addressed her concerns regarding those services in our discussion of the substantive issues, we need not also address them as procedural errors.