## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

May 15 2017, 9:17 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jeffery A. Earl
Danville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In re the Termination of the Parent-Child Relationship of A.S. (Minor Child) and<br><br>C.T. (Father),<br>*Appellant-Respondent,*<br><br>v.<br><br>The Indiana Department of Child Services,<br>*Appellee-Petitioner* | May 15, 2017<br><br>Court of Appeals Case No. 32A05-1610-JT-2398<br><br>Appeal from the Hendricks Superior Court<br><br>The Honorable Karen M. Love, Judge<br><br>Trial Court Cause No. 32D03-1512-JT-10 |

**Vaidik, Chief Judge.**

# Case Summary

[1] A.S., a special-needs child, spent the first ten weeks of his life in the hospital. V.S. ("Mother") and C.T. ("Father") failed to visit A.S. daily and when they did visit him it was at midnight and for twenty minutes. The Department of Child Services (DCS) got involved and A.S. was adjudicated a child in need of services (CHINS). DCS later petitioned to terminate Mother's and Father's parental rights. The court granted DCS's petition, concluding that there was a reasonable probability that the conditions that resulted in A.S.'s removal and continued placement outside the home would not be remedied. Father appeals the ruling,[1] arguing that the evidence is insufficient to support the trial court's conclusion. Finding sufficient evidence, we affirm.

# Facts and Procedural History

[2] A.S. was born premature on June 13, 2014, and spent approximately ten weeks in the hospital. A.S. had significant health problems, including needing full-time oxygen and a feeding tube. Mother and Father, who were dating at the time, visited A.S. every-other night at midnight and stayed for approximately twenty minutes per visit. On July 22, DCS received a report detailing concerns about Mother's and Father's ability to parent A.S. Based on the initial report,

---

[1] Mother is not a party to this appeal. During the termination hearing, Mother notified the court that she was voluntarily terminating her parental rights to A.S. *See* Tr. pp. 100-110. Accordingly, this opinion discusses the facts relevant to Father's case.

DCS investigated the situation and on July 31 filed a petition with the trial court alleging that A.S. was a CHINS. Among other things, DCS cited Mother's and Father's failure to spend an appropriate amount of time with A.S. in the hospital and their inability to maintain stable housing.

[3] Multiple hearings were held regarding DCS's petition. During these proceedings, A.S. was removed from Mother's and Father's care and was placed with the maternal grandmother ("Grandmother"). At one hearing, Father stipulated that A.S. was a CHINS given his medical issues and the fact that the parents had failed to appropriately visit A.S. in the hospital. The court adjudicated A.S. a CHINS on November 20, 2014, and ordered that A.S. remain in Grandmother's care.

[4] That same day, the trial court also issued a dispositional order that set multiple requirements for Father, including: enroll and complete any program recommended by the Family Case Manager or other service provider, complete a parenting assessment, secure and maintain suitable housing and a stable source of income, attend all scheduled visits with A.S., and participate in Fatherhood Engagement Services. Ex. 7. DCS then referred Father for a parental-functioning assessment and a mental-health assessment. Father never met with the parental-functioning-assessment provider, but he did complete the mental-health assessment. He was diagnosed with Attention Deficit Hyperactivity Disorder (ADHD) and was referred to individual and group therapy and additional services to deal with anger and stress management. Father did not attend any follow-up sessions.

[5] Additionally, Father has failed to maintain stable housing and employment. Between November 2014 and May 2016, he had at least nine different addresses. He has lived in a motel in Plainfield, his car, Terre Haute, Florida, Georgia, and Bloomington. Over this same period, Father has held at least six different jobs, none for longer than six months. Father quit four of those jobs and was laid off from a fifth.

[6] Regarding visitation with A.S., DCS arranged for Father to have supervised visits three times a week in order to facilitate bonding and attachment. Father, however, was inconsistent with his visits. From November 2014 to October 2015, Father had short, sporadic visits with A.S., including no contact with A.S. in May or June 2015—when Father was living in Florida and Georgia. When Father returned to Indiana, he resumed his sporadic visitation schedule. Father then ceased all contact in October. Father did not attempt to contact or visit A.S. again until January 2016—after the petition to terminate his rights was filed. When he resumed his visits, Father saw A.S. approximately once a month until April. In April, Father began having supervised visits for one hour per week.

[7] Father was also ordered to participate in DCS's Fatherhood Engagement Services program, which was recommended to help Father gain financial stability and maintain consistent visitation with A.S. Father initially failed to comply with the trial court's order but began participating in the program in November 2015—a year after the court ordered participation. He worked with a counselor to help him maintain his finances and secure stable housing.

[8] In December 2015, DCS petitioned the court to terminate Father's parental rights to A.S. A multi-day hearing was held in March and May 2016. Multiple witnesses testified, including the Family Case Manager, the Guardian Ad Litem (GAL), and Father.

[9] Megan Al-Hassani, the Family Case Manager, recommended that the court terminate Father's parental rights to A.S., who was almost two years old at the time of the hearing. She recommended termination because, throughout A.S.'s life, Father "had not been consistent in visiting [A.S.] to facilitate that bond and attachment. [Father] did not follow through with any of the recommended services to help alleviate or remedy the initial concerns that led to removal[.]" Tr. p. 175. She acknowledged that Father had been working with Fatherhood Engagement Services since November 2015, but his recent participation did not change her recommendation because Father continued to display "little to no interest in [A.S.]." *Id.* at 177. Al-Hassani stressed that termination of Father's parental rights and adoption for A.S. was in A.S.'s best interests.

[10] The GAL, Suzanne Conger, agreed with Al-Hassani. She recommended that Father's parental rights should be terminated because he had had no stability since DCS became involved in 2014 and because he had failed to gain stability even after re-engaging with DCS in November 2015—Father had moved at least twice and held two or three different jobs. She stated that A.S. needed a stable home because of his health issues, which included developmental delays—he did not walk until he was eighteen months old and at almost two years old he had only five vocabulary words when other children his age know

upwards of twenty-five words. Because of these delays, A.S. had to communicate through sign language and continued to undergo speech, occupational, and physical therapy. DCS set up these therapies for A.S., and most of his appointments were conducted at Grandmother's house. In addition to his therapy appointments, Grandmother was spending one to two hours a day doing therapy exercises at home. The GAL stated that termination of Father's parental rights and adoption was in A.S.'s best interests.

[11] Father disagreed with Al-Hassani's and the GAL's recommendations that termination of his parental rights was in A.S.'s best interests. Father admitted that, other than the initial mental-health assessment, he had not started any of his recommended programs, including the parenting assessment. Regarding his employment, Father was currently working full-time for a Bloomington-based company, but he had been employed there for only a few months. He emphasized that he had been more consistent with his visits with A.S. since January 2016 and that he had supervised visits with A.S. for one hour each week since April. Last, Father said that he had not missed any meetings with Fatherhood Engagement Services' counselors since starting with them in November 2015. He was working on his finances—he had opened two bank accounts—and to secure housing. At the time of the hearing, he was living in Bloomington with his new girlfriend at her parents' house. Father said that it was a temporary situation and that the following week he had appointments to find an apartment in Bloomington. Father concluded that he did not believe that termination of his parental rights would be in A.S.'s best interests.

The trial court agreed with Al-Hassani and the GAL and issued its termination order in September 2016. The court entered numerous findings of fact and conclusions, including:

> 67. [A.S.] has special needs, including inability to speak and slow development.

> 83. Because of instability in both housing and employment or income, and the lack of a bond between Father and [A.S.] and Father's failure to engage in services to help him parent this special needs child and [A.S.'s] need for stability with [a] caregiver who will engage in occupational therapy, physical therapy, speech therapy and sign language, it is in the best interests of [A.S.] that Father's rights be terminated.

Appellant's App. Vol. II pp. 8-20. The court concluded: the conditions that resulted in A.S.'s removal from Father's home and continued placement outside the home were not likely to be remedied; continuation of the parent-child relationship posed a threat to A.S.'s well-being; termination was in A.S.'s best interests; and DCS's plan for adoption was satisfactory. *Id.* at 19.

Father now appeals.[2]

---

[2] We note that Father's briefs are single-spaced in violation of Indiana Appellate Rule 43(E), which provides: "All text shall be **double-spaced** except footnotes, tables, charts, or similar material and text that is blocked and indented shall be single-spaced. Single-spaced lines shall be separated by at least 4-point spaces."

# Discussion and Decision

Father contends that there is insufficient evidence to support termination of his parental rights. When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. *In re K.T.K.*, 989 N.E.2d 1225, 1229 (Ind. 2013). Rather, we consider only the evidence and reasonable inferences that are most favorable to the judgment of the trial court. *Id.* When a trial court has entered findings of fact and conclusions, we will not set aside the trial court's findings or judgment unless clearly erroneous. *Id.* To determine whether a judgment terminating parental rights is clearly erroneous, we review whether the evidence clearly and convincingly supports the trial court's findings and whether the findings clearly and convincingly support the judgment. *In re V.A.*, 51 N.E.3d 1140, 1143 (Ind. 2016).

A petition to terminate parental rights must allege, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must prove the alleged circumstances by clear and convincing evidence. *In re K.T.K.*, 989 N.E.2d at 1231.

[16] Father argues that there is insufficient evidence to support the trial court's conclusion that there is a reasonable probability that the conditions that resulted in A.S.'s removal or the reasons for placement outside the home will not be remedied.[3] He contends that the only reason DCS removed A.S. from his care was due to his failure to "sufficiently visit and bond with his son." Appellant's Br. p. 8.

[17] Father's argument ignores the fact that DCS also cited his inability to maintain stable housing as a reason for removal. Ex. 1; Appellee's Br. p. 4. At the termination hearing, Father stated that he still had not secured stable housing and was living with his new girlfriend and her parents. He was hoping to move into his own apartment in the next month or two. Before that, Father had at least eight different addresses over the course of two years. A.S. requires ongoing speech, physical, and occupational therapy, and most of his appointments are conducted in the home. A.S. needs a stable home, with a

---

[3] Father also argues that there is insufficient evidence to support the trial court's conclusion that there is a reasonable probability that continuation of the parent-child relationship poses a threat to A.S.'s well-being. Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive and requires clear and convincing evidence of only one of the circumstances listed in subsection (B). *See R.J. v. Ind. Dep't. of Child Servs.*, 56 N.E.3d 729 (Ind. Ct. App. 2016). Because we conclude that there is sufficient evidence to support the trial court's conclusion that there is a reasonable probability that the conditions resulting in A.S.'s removal will not be remedied, we do not address this argument.

permanent address, so that he can get the therapies he needs. Father has shown that he is unable to provide such an environment for A.S.

[18] Father also argues that the trial court failed to take into consideration evidence of his changed conditions. These changes are to be balanced against habitual patterns of conduct, and the trial court is to judge the parent's fitness at the time of the termination hearing. *See In re K.E.*, 39 N.E.3d 641, 647 (Ind. 2015). As proof of his changed conditions, Father highlights his participation in Fatherhood Engagement Services, his consistent visits with A.S. since January 2016, and his employment history—noting that although he has had multiple jobs since the CHINS petition was filed, he has been employed for the majority of these proceedings.[4]

[19] Father's argument omits that habitual conduct may include "lack of adequate housing and employment, [and] the services offered to the parent and the parent's response to those services can also be evidence demonstrating that conditions will be remedied." *Id.* (quotations omitted). As already discussed, Father has not maintained stable housing. Nor has he managed to maintain stable employment. Father has had upwards of six different jobs during these proceedings, with no job lasting longer than six months. The fact that he has been employed for the majority of these proceedings is not evidence of **stable**

---

[4] Father also challenges three of the trial court's findings of fact. We do not address Father's challenges because we find that the unchallenged findings, standing alone, are sufficient to support the trial court's conclusions. *See Kitchell v. Franklin*, 26 N.E.3d 1050, 1059 (Ind. Ct. App. 2015), *trans. denied.*

employment. Additionally, Father, by his own admission, failed to comply with the trial court's initial order that he participate in and complete services recommended by DCS. He only began working with DCS four months before the termination hearing. The trial court is within its discretion to disregard efforts made only shortly before termination and put more weight on Father's history of conduct before those efforts. *K.T.K.*, 989 N.E.2d at 1234. We conclude that there is sufficient evidence to conclude that there is a reasonable probability that the conditions that resulted in A.S.'s removal from Father or the reasons for placement outside Father's home will not be remedied.

[20] Affirmed.

Bailey, J., and Robb, J., concur.