## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jan 11 2018, 8:19 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT N.E.

Kara A. Hancuff
Monroe County Public Defender
Bloomington, Indiana

ATTORNEY FOR APPELLANT M.C.

Karen E. Wrenbeck
Monroe County Public Defender
Bloomington, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parental Rights of:

M-l.C., M-n.C. & M.E.C. (Minor Children)
    and
N.E. (Mother) and M.C. (Father)

*Appellants-Respondents,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner*

January 11, 2018

Court of Appeals Case No.
53A05-1706-JT-1264

Appeal from the Monroe Circuit Court VII

The Honorable Stephen Galvin, Judge

Trial Court Cause Nos.
53C07-1608-JT-519
53C07-1608-JT-520
53C07-1608-JT-521

**Vaidik, Chief Judge.**

# Case Summary

[1] M.C. ("Father") and N.E. ("Mother") appeal the termination of their parental rights to their three children. Finding no error, we affirm.

# Facts and Procedural History

[2] The undisputed facts are set forth in the trial court's order.[1] Mother and Father are the parents to three children: twins born in June 2013 and another child born in November 2014 (collectively "the children"). On March 7, 2015, marijuana smoke was detected coming from Mother's apartment in Bloomington. Officers searched the apartment and found marijuana, crack cocaine, and eighty-eight Lortab pills in the bedroom where Mother and the children slept. The children could access the marijuana. Upon further search of the apartment, officers found two loaded guns and stolen lottery tickets. Mother was arrested and claimed that the lottery tickets belonged to Father. When questioned by officers, Father admitted that he had been at Mother's home the day before she was arrested. Father also submitted to a drug screen, which was positive for marijuana.

[3] The children were removed from their parents' care at the time of Mother's arrest. Two of the children were suffering from coughs, and one child was

---

[1] Because neither Mother nor Father challenge the trial court's findings of fact, we accept them as true. *See Maldem v. Arko*, 592 N.E.2d 686 (Ind. 1992) ("Because Maldem does not challenge the findings of the trial court, they must be accepted as true.").

recovering from pneumonia. Department of Child Services (DCS) filed children in need of services (CHINS) petitions, and the children were adjudicated CHINS on May 7 and later placed in a foster-care home, where they have remained for over two years. In June 2015, a dispositional hearing was held for both Mother and Father. Both parents were ordered to: maintain weekly contact with the DCS family case manager; participate in home-based counseling; complete a substance-abuse assessment and complete all treatment recommendations; submit to random drug and alcohol screens; and attend all scheduled visits with the children.

[4] Amanda Kelly, a home-based family case worker with Ireland Home Based Services, began working with Mother and Father in November 2015. She supervised visits between the parents and the children and offered parenting instruction to Mother and Father. There were many issues with the visits: Mother had difficulty supervising the children by herself; Mother did not follow through on disciplining the children; Kelly had to intervene to ensure the children's safety; Father was routinely late to visits; and the parents failed to bring adequate supplies, such as diapers and wipes.

[5] Debra Hoesman, a mental-health practitioner, began counseling with Mother in February 2016. Hoesman completed a substance-abuse assessment on Mother in May 2016 and diagnosed Mother with cannabis dependence and major depressive disorder. Hoesman recommended that Mother have weekly therapy sessions. Mother attended only ten sessions, with her last appointment in June 2016. During this time, Mother was also inconsistent in submitting to drug

screens, but when she did submit, she repeatedly failed. Mother frequently tested positive for marijuana and twice tested positive for heroin. Around the time Mother stopped seeing Hoesman, the DCS case manager noticed an increase in Mother's marijuana use. Mother told the case manager that she used marijuana as a coping mechanism for stress.

[6] Meanwhile, Father continued his involvement with illegal drugs and was arrested in June 2016 at Mother's apartment. Officers found cocaine, forty grams of heroin, and a stolen handgun. Father was convicted in April 2017 of one count of dealing in a narcotic drug and sentenced to eighteen years in the Indiana Department of Correction (IDOC), with six years suspended. He will be incarcerated for approximately eight more years.[2] Before his arrest, Father did not engage with DCS or its service providers, telling them that he was not interested in services, that he "was a good father," that he had other things to do, and that he "was living the life and that was the way he had to make a living." Appellants' App. Vol II p. 27[3]; Tr. Vol. II p. 15. Father also told the case manager that he did not have a substance-abuse problem, but he never submitted to a drug screen after the CHINS adjudications.

---

[2] The trial court's findings state the Father will be released in five years. However, IDOC's offender search lists Father's projected release date as January 2026. https://www.in.gov/apps/indcorrection/ofs/ofs (last visited 01/04/2018).

[3] Mother and Father appealed separately but filed only one appendix. In his brief, Father stated that he would not "be filing an Appendix, as it would be identical to Mother's and thus unduly duplicative." Father's Appellant's Br. p. 4 (citing Ind. Appellate Rule 50(E)). Accordingly, we attribute the single appendix to both parties.

[7] Shortly after Father's arrest, Mother moved to Michigan but did not tell the DCS case manager that she was moving. Mother claimed that she moved because she was going to be evicted and needed the support of family. But Mother had two sisters, two aunts, and two uncles living in Bloomington when she moved. After moving, Mother did not request that DCS arrange for her services to be transferred to Michigan. Mother also failed to maintain weekly contact with the case manager.

[8] Mother last visited the children on June 15, 2016. She never traveled from Michigan to Indiana to see the children. Mother was supposed to see the children in November 2016 but did not make the trip. The children were "extremely disappointed." *Id.* at 30. Mother later requested to have video contact with the children, but her request was denied because it had been approximately seven months since she had seen the children.

[9] In August 2016, DCS filed its termination petitions. A hearing on the petitions was held in February 2017. During the hearing, the DCS case manager and Court Appointed Special Advocate (CASA) for the children testified that termination of Mother's and Father's parental rights was in the children's best interests. *See* Tr. Vol. II pp. 63-64, 81. The trial court concluded: that the children had been removed from their parents for at least six months under a dispositional decree; that there is a reasonable probability that the conditions that resulted in the removal of the children or the reasons for their continued placement outside of the home would not be remedied; that the continuation of the parent-child relationship posed a threat to the children's well-being; that

termination was in the children's best interests; and that a satisfactory plan for the care and treatment of the children was in place—adoption. The trial court terminated Mother's and Father's parental rights.

[10] Mother and Father appeal.

# Discussion and Decision

[11] Mother and Father filed separate briefs, and where possible, we address their arguments as one. Both parents argue that the trial court erred when it terminated their parental rights. When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. *In re K.T.K.*, 989 N.E.2d 1225, 1229 (Ind. 2013). Rather, we consider only the evidence and reasonable inferences that are most favorable to the judgment of the trial court. *Id.* When a trial court has entered findings of fact and conclusions, we will not set aside the trial court's findings or judgment unless clearly erroneous. *Id.* To determine whether a judgment terminating parental rights is clearly erroneous, we review whether the evidence supports the trial court's findings and whether the findings support the judgment. *In re V.A.*, 51 N.E.3d 1140, 1143 (Ind. 2016).

[12] A petition to terminate parental rights must allege, among other things:

> (B) that one (1) of the following is true:
>
> > (i) There is a reasonable probability that the conditions
> > that resulted in the child's removal or the reasons for

placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must prove the alleged circumstances by clear and convincing evidence. *In re K.T.K.*, 989 N.E.2d at 1231. If the court finds that the allegations in a petition are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[13] Mother and Father both contend that the evidence is insufficient to support the trial court's conclusion that there is a reasonable probability that the conditions that resulted in the children's removal or continued placement outside the home would not be remedied. When a parent challenges this conclusion, we engage in a two-step analysis. "First, we must ascertain what conditions led to their placement and retention in foster care. Second, we determine whether there is a reasonable probability that those conditions will not be remedied." *K.T.K.*, 989 N.E.2d at 1231. "The trial court must consider a parent's habitual pattern

of conduct to determine whether there is a substantial probability of future neglect or deprivation." *Id.*

[14] The children were removed from the home due to Mother's and Father's drug use and the parents' inability to provide an adequate home or proper care for their children. These conditions did not change over the course of the CHINS proceedings for either parent. Regarding Mother, she repeatedly failed her drug screens, testing positive for marijuana and heroin. Mother contends that she was drug free after moving to Michigan. She stated that she was working at Walmart, which requires all potential employees to submit to drug tests. But the trial court rejected this argument because Mother worked for Walmart when she lived in Bloomington and repeatedly tested positive for marijuana. Appellant's App. Vol. II p. 29. Mother's argument is a request for us to reweigh the evidence, which we will not do. *K.T.K.*, 989 N.E.2d at 1229. Mother also struggled to care for the children during her supervised visits. She failed to follow through on discipline, and on at least one occasion Kelly had to intervene to keep the children safe. Furthermore, Mother also stopped visiting the children after moving to Michigan and has not seen them since June 2016.[4]

---

[4] Mother also argues that DCS ignored her requests to have services transferred to Michigan, and thus, the trial court erred when it terminated her parental rights. But the trial court's findings of fact explicitly state that Mother "did not request that DCS arrange for her to participate in services in Michigan. DCS could have arranged for drug screens and other services in Michigan." Appellant's App. Vol. II p. 28. Mother's argument is nothing more than a request for us to reweigh the evidence, which we will not do. *K.T.K.*, 989 N.E.2d at 1229.

[15]     As for Father, he contends that the State relied solely on his incarceration to support its petition for termination. Father compares his situation to that of the father in *K.E. v. Indiana Department of Child Services*, 39 N.E.3d 641 (Ind. 2015). In *K.E.*, the father was incarcerated before his child was born and did "everything he had been asked while incarcerated, actively participated in substance abuse programs, established regular visitation with K.E., and spoke to K.E. every night on the phone." *Id.* at 645. Our Supreme Court overturned the termination of father's parental rights. Here, Father's situation is readily distinguishable from *K.E.* After the CHINS adjudications, Father refused to engage with DCS or any of its service providers. He told them that he was not interested in services, that he "was a good father," that he had other things to do, and that he "was living the life and that was the way he had to make a living." Appellants' App. Vol II p. 27; Tr. Vol. II p. 15. Father was eventually incarcerated for selling drugs. Father has not participated in any services since his incarceration. There is sufficient evidence to show that neither Mother nor Father prioritized the needs of the children above their own. The trial court did not err when it concluded that there is a reasonable probability that the conditions that resulted in the children's removal or the reasons for their placement outside the home will not be remedied.[5]

---

[5] Father also argues that there is insufficient evidence to support the trial court's conclusion that there is a reasonable probability that continuation of the parent-child relationship poses a threat to the children's well-being. Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive and requires clear and convincing evidence of only one of the circumstances listed in subsection (B). *See In re I.A.*, 903 N.E.2d 146, 153 (Ind. Ct. App. 2009). Because we conclude that there is sufficient evidence to support the trial court's conclusion

[16] Additionally, Mother and Father both challenge the court's conclusion that termination was in the children's best interests. To determine what is in the children's best interests, the trial court must look to the totality of the evidence. *In re A.D.S.*, 987 N.E.2d 1150, 1158 (Ind. Ct. App. 2013), *trans. denied.* In doing so, the trial court must subordinate the interests of the parent to those of the children. *Id.* The court need not wait until the children are irreversibly harmed before terminating the parent-child relationship. *Id.* We have previously held that recommendations by both the DCS case manager and CASA to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is clear and convincing evidence that termination is in the best interests of the children. *Id.* at 1158-59. Here, both the DCS case manager and the CASA testified that termination was in the children's best interests. *See* Tr. Vol. II pp. 63-64, 81. And, as already discussed, there is sufficient evidence to support the conclusion that the conditions resulting in removal or placement outside of the home will not be remedied. Furthermore, the children have spent most of their lives in foster care because the parents are incapable of providing a safe, stable home free of illegal drug use. The children, however, were excelling in their foster home, which was pre-adoptive. The court found that the children were "smart, happy, [and] well-adjusted" and that adoption was a satisfactory

---

that there is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home will not be remedied, we do not address this argument.

plan for them. Appellant's App. Vol. II p. 31. Accordingly, the trial court did not err when it concluded that termination was in the children's best interests.

[17] Affirmed.

May, J., and Altice, J. concur.