## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Sep 12 2018, 6:25 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT (FATHER)

Justin R. Wall
Wall Legal Services
Huntington, Indiana


ATTORNEY FOR APPELLANT (MOTHER)

Cara Schaefer Wieneke
Wieneke Law Office, LLC
Brooklyn, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Katherine A. Cornelius
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In Re the Termination of the Parent-Child Relationship of N.H. (Minor Child);

T.H. (Mother) and J.H. (Father),

*Appellants-Respondents,*

v.

The Indiana Department of Child Services

*Appellee-Petitioner.*

September 12, 2018

Court of Appeals Case No.
18A-JT-410

Appeal from the Wells Circuit Court

The Honorable Kenton W. Kiracofe, Judge

Trial Court Cause No.
90C01-1707-JT-18

**Pyle, Judge.**

## Statement of the Case

T.H. ("Mother") and J.H. ("Father") each appeal the termination of the parent-child relationship with their daughter, N.H. ("N.H."), claiming that there is insufficient evidence to support the termination. Both parents argue that Department of Child Services ("DCS") failed to prove by clear and convincing evidence that there was a reasonable probability that the conditions that resulted in N.H.'s removal would not be remedied and that termination was in N.H.'s best interests. Father also argues that there is insufficient evidence to support the termination because DCS failed to prove by clear and convincing evidence that adoption was a satisfactory plan for N.H.'s care and treatment. Concluding there is sufficient evidence to support the termination of the parent-child relationships, we affirm the trial court's judgment.

We affirm.

## Facts

Mother and Father are the parents of N.H., who was born in February 2010. In 2015, while on probation and home detention, Father was charged with, convicted of, and incarcerated for operating a motor vehicle after forfeiture of his license for life and for being an habitual traffic violator. N.H. was removed from Mother's care and placed in foster care in June 2016 after the then-six-year-old girl showed neighbors the needles that Mother used to take drugs and

explained how Mother used the needles to feel better when she was sick. At the time, Mother lacked stable housing and was living with N.H. in the home of a registered sex offender who had previously molested his young daughters.

[4] The trial court adjudicated N.H. to be a child in need of services ("CHINS") the following month. A September 2016 dispositional order required Mother to successfully complete several services, including a psychological evaluation, a substance abuse assessment, supervised visitation, and random drug screens. Because Father was incarcerated during the CHINS proceeding, his court-ordered services were deferred until his release.

[5] In July 2017, after Mother failed to comply with the trial court's order to participate in the court-ordered services, and while Father was still incarcerated, DCS filed a petition to terminate both parents' parental rights. The evidence presented at the November 2017 termination hearing revealed that Mother had not successfully completed the court-ordered services. For example, during the first four months of 2017, Mother tested positive fourteen times for a variety of substances, including cocaine, fentanyl, oxycodone, methadone, methamphetamine, amphetamine, and morphine. At the time of the hearing, Mother also lacked stable housing and employment and had been incarcerated for the previous seven months for a probation violation. Although she had attended visitation with N.H. following the CHINS adjudication, Mother had not seen her daughter for the prior seven months. Mother had also been charged with theft while she was incarcerated.

[6] Also at the hearing, Father testified that he had been incarcerated since September 2015. Over the past two years, he had written N.H. two or three letters and had sent her a birthday card. He had also spoken to her on the phone three or four times during Mother's supervised visitations. Father had made no other attempts to contact N.H. He had also not contacted the DCS case manager to request additional calls or visits. Father further testified that he had completed Mothers Against Meth and literacy programs while incarcerated but offered no documents in support of his testimony. He testified that his earliest release date was March 2018.

[7] DCS Family Case Manager Lindsey Feinberg ("Case Manager Feinberg") testified that the conditions that resulted in N.H.'s removal had not been remedied "due to the family's substance use history . . . [and] issues with their stability in housing." (Tr. 60). Case Manager Feinberg further testified that Father had significant criminal and substance abuse histories and had not had any substance abuse counseling while incarcerated.[1] Case Manager Feinberg agreed that the "major issues that got both of these parents involved in this case ha[d]n't been addressed." (Tr. 72). She further explained that N.H. had not been in either parent's care for the previous seventeen months, and she explained that the plan for N.H. was foster parent adoption.

---

[1] The trial court's termination order provides that "Father has a substantial criminal history which includes possession with intent to deal, legend drug deception, receiving stolen property, operating a vehicle as a habitual traffic violator, and driving while never receiving a license." (Mother's App. at 49). Father does not challenge the trial court's finding.

[8] Guardian Ad Litem Beth Webber ("GAL Webber") testified that the reasons for N.H.'s removal were not likely "to be fixed at this point." (Tr. 93). GAL Webber specifically testified as follows:

> [A]s we sit her today, none of it's fixed. They're not even out to be able to start services. The – the problem is you have to look at the past history because that's the best predictor of future behavior, and the past history is in and out of incarceration. [Mother] even has a new criminal charge from a time while she was incarcerated for theft.

(Tr. 94). According to GAL Webber, termination of both parental relationships and adoption was in N.H.'s best interests.

[9] Following the hearing the trial court found that "neither parent had stable housing, employment, or the financial means to provide food, clothing, shelter, medical care, or support to the minor child." (Mother's App. at 50). The trial court further concluded that "Mother and Father ha[d] had over one year and five months to accomplish the steps necessary to have their child returned to their care. Children cannot wait indefinitely for their parents to work toward preservation and reunification." (Mother's App. 53). The trial court terminated the parental rights of both parents, and both parents now appeal the terminations.

# Decision

[10] The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *In re K.T.K.*, 989 N.E.2d 1225, 1230 (Ind. 2013). However, the law provides for

termination of that right when parents are unwilling or unable to meet their parental responsibilities. *In re Bester*, 839 N.E.2d 143, 147 (Ind. 2005). The purpose of terminating parental rights is not to punish the parents but to protect their children. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *K.T.K.*, 989 N.E.2d at 1229. Rather, we consider only the evidence and reasonable inferences that support the judgment. *Id*. Where a trial court has entered findings of fact and conclusions thereon, we will not set aside the trial court's findings or judgment unless clearly erroneous. *Id.* (citing Ind. Trial Rule 52(A)). In determining whether the court's decision to terminate the parent-child relationship is clearly erroneous, we review the trial court's judgment to determine whether the evidence clearly and convincingly supports the findings and the findings clearly and convincingly support the judgment. *Id.* at 1229-30.

A petition to terminate parental rights must allege:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

> > (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

> (C) that termination is in the best interests of the child; and

> (D) that there is a satisfactory plan for the care and treatment of the child.

IND. CODE § 31-35-2-4(b)(2). DCS must prove the alleged circumstances by clear and convincing evidence. *K.T.K.*, 989 N.E.2d at 1231.

[13] Here, both parents argue that there is insufficient evidence to support the termination of their parental rights. Specifically, they first contend that the evidence is insufficient to show that there is a reasonable probability that the conditions that resulted in N.H.'s removal or the reasons for placement outside the home will not be remedied.

[14] In determining whether the conditions that resulted in a child's removal or placement outside the home will not be remedied, we engage in a two-step analysis. *In re E.M.,* 4 N.E.3d 636, 642-43 (Ind. 2014). We first identify the conditions that led to removal or placement outside the home and then determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* at 643. The second step requires trial courts to judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions and balancing any recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* DCS need not rule out all possibilities of change. *In re Kay. L.,* 867 N.E.2d 236, 242 (Ind. Ct.

App. 2007). Rather, DCS need establish only that there is a reasonable probability that the parent's behavior will not change. *Id.*

[15] Here, our review of the evidence reveals that N.H. was removed from Mother because of Mother's drug use and unstable housing. Evidence presented at the termination hearing revealed that Mother had failed to successfully complete any of the court-ordered services. Specifically, during the first four months of 2017, Mother tested positive fourteen times for a variety of substances, including cocaine, fentanyl, oxycodone, methadone, methamphetamine, amphetamine, and THC. At the time of the termination hearing, Mother also lacked stable housing and employment and had been incarcerated for the previous seven months for a probation violation. Mother had also been charged with theft while she was incarcerated. This evidence supports the trial court's conclusion that there was a reasonable probability that the conditions that resulted in N.H.'s removal from Mother would not be remedied.

[16] Our review of the evidence further reveals that N.H. could not have been placed with Father because he was incarcerated at the time she was removed from Mother. Father argues that there is insufficient evidence to support the termination of his parental rights in light of *K.E. v. Indiana Dep't of Child Servs.*, 39 N.E.3d 641 (Ind. 2015). In the *K.E.* case, the father was incarcerated at the time of the child's birth, and his release date was over two years away at the time of the termination hearing. After the trial court terminated the father's parental relationship with his child, the Indiana Supreme Court reversed the termination order. *Id.* at 649. Specifically, the Indiana Supreme Court noted

the positive steps that the father had taken while incarcerated, which included: (1) completing twelve inmate programs; (2) attending alcoholics and narcotics anonymous meeting; (3) making plans for housing and employment upon his release from incarceration; and (4) maintaining frequent and meaningful contact with his child, including weekly visits with the child and calling the child every night to speak with him on the telephone. Based on these specific facts and circumstances, the Indiana Supreme Court held that the father had made "substantial efforts . . . to improve his life by learning to become a better parent, establishing a relationship with [his child] . . . and attending substance abuse classes[.]" *Id.*

[17] Although *K.E.* and the present case have some similarities, there are substantial differences. First, the father in *K.E.* had made significant efforts to better himself while incarcerated. He had specifically completed twelve different programs that "particularly targeted parenting and life skills, along with addressing substance abuse." *Id.* Here, although Father testified that he had completed both Moms against Meth and literacy programs, he had no documentation to support his testimony and he had completed no parenting skills programs. Further, and notably, despite Father's substance abuse issues, he had not completed any substance abuse programs.

[18] More important is that the father in *K.E.* made significant efforts to maintain a meaningful relationship with his child. Specifically, he visited the child weekly and telephoned the child every night. As a result, the father and his child were bonded. Here, the only contact that Father has had with N.H. following her

removal from Mother has been talking to her on the phone three or four times total during Mother's supervised visits and sending her two or three letters and a birthday card. In addition, Father never contacted DCS to request additional calls or visits. For these reasons, Father's reliance on *K.E.* is misplaced, and the evidence supports the trial court's conclusion that there was a reasonable probability that the conditions that resulted in N.H.'s removal would not be remedied.

[19] Next, Mother and Father both argue that there is insufficient evidence that the termination was in N.H.'s best interests.[2] In determining whether termination of parental rights is in the best interests of a child, the trial court is required to look at the totality of the evidence. *In re D.D.*, 804 N.E.2d 258, 267 (Ind. Ct. App. 2004), *trans. denied*. In so doing, the court must subordinate the interests of the parents to those of the child involved. *Id.* Termination of the parent-child relationship is proper where the child's emotional and physical development is threatened. *In re R.S.*, 774 N.E.2d 927, 930 (Ind. Ct. App. 2002), *trans. denied*. "'A parent's historical inability to provide adequate housing, stability and supervision coupled with a current inability to provide the same will support a finding that continuation of the parent-child relationship is contrary to the child's best interest.'" *In re B.D.J.*, 728 N.E.2d 195, 203 (Ind. Ct.

---

[2] Mother points out that the trial court failed to make a specific finding that termination was in N.H.'s best interests. However, we agree with the State that the "court's order is sufficient, taken as a whole, to determine the court found termination of the parent-child relationship[s] was in [N.H.'s] best interests." (State's Br. 20).

App. 2000) (quoting *Matter of Adoption of D.V.H.*, 604 N.E.2d 634, 638 (Ind. Ct. App. 1992), *trans. denied, superceded by rule on other grounds*). Further, the testimony of the service providers may support a finding that termination is in the child's best interests. *McBride v. Monroe Cty. Office of Family and Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003).

[20] Here, our review of the evidence reveals that Mother and Father have historically been unable to provide housing, stability, and supervision for their children and were unable to provide the same at the time of the termination hearing. In addition, GAL Webber testified that termination was in the N.H.'s best interests. The testimony of this service provider, as well as the other evidence previously discussed, supports the trial court's conclusion that termination was in the children's best interests.

[21] Last, Father argues that DCS does not have a satisfactory plan for N.H.'s care and treatment. This Court has previously explained that the plan for the care and treatment of the child need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated. *In re L.B.,* 889 N.E.2d 326, 341 (Ind. Ct. App. 2008). Here, the DCS caseworker testified the plan for the care and treatment of N.H. is foster parent adoption. This is a satisfactory plan. *See In re A.N.J.,* 690 N.E.2d 716, 722 (Ind. Ct. App. 1997).

Affirmed.

Vaidik, C.J., and Barnes, Sr.J., concur.