

FILED

Aug 11 2025, 8:56 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



IN THE

# Court of Appeals of Indiana

Planned Parenthood Great Northwest, Hawai'i, Alaska, Indiana, Kentucky, Inc., et al.,

*Appellants-Plaintiffs*

v.

Members of the Medical Licensing Board of Indiana, in their official capacities, et al.,

*Appellees-Defendants*

---

August 11, 2025

Court of Appeals Case No.
24A-PL-2467

Appeal from the Monroe Circuit Court

The Honorable Kelsey B. Hanlon, Special Judge

Trial Court Cause No.
53C06-2208-PL-1756

---

**Opinion by Judge Mathias**

Chief Judge Altice and Judge DeBoer concur.

**Mathias, Judge.**

[1] Following the Supreme Court of the United States's decision on abortion rights in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), the Indiana General Assembly enacted a revised version of Indiana Code section 16-34-2-1 (2022),[1] which is commonly referred to as Indiana's abortion ban. According to that statute, performing an abortion in Indiana "shall in all instances be a criminal act,"[2] except when performed in one of three circumstances: (1) when an abortion is necessary either to save the woman's life or to prevent a serious health risk to her; (2) when there is a lethal fetal anomaly; or (3) when the pregnancy resulted from rape or incest. I.C. § 16-34-2-1(a).

[2] The first exception (the "statutory Life or Health Exception") may apply at any time during the pregnancy so long as the decision is based on a "reasonable medical judgment" and certain procedural requirements are satisfied. I.C. § 16-

---

[1] The parties refer to the relevant statutes as Senate Bill 1 (or S.B. 1), which was the initial legislative vehicle that resulted in the revised versions of the statutes relevant to this appeal. The finalized legislative vehicle that resulted in the revised statutes consisted of fifty-four enumerated sections. Pub. L. 179-2022 (ss) (eff. Sept. 15, 2022). However, only the revised version of Indiana Code section 16-34-2-1, and its incorporated definitions, is relevant to this appeal.

[2] Indiana Code section 16-34-2-7(a) generally provides that "a person who knowingly or intentionally performs an abortion prohibited by [section 16-34-2-1] commits a Level 5 felony."

34-2-1(a)(1)(A)(i) ("before the earlier of viability of the fetus or twenty (20) weeks of postfertilization age[3] of the fetus"), (a)(3)(A) ("and any time after"). The Indiana Code further defines a "serious health risk" under the statutory Life or Health Exception to be "a condition . . . that has complicated the mother's medical condition and necessitates an abortion to prevent death or a serious risk of substantial and irreversible physical impairment of a major bodily function." I.C. § 16-18-2-327.9. That definition expressly excludes "psychological or emotional conditions" as well as "a claim or diagnosis that the woman will engage in conduct that she intends to result in her death or in physical harm." *Id.*

[3] Planned Parenthood and other medical-care providers challenged the facial validity of Indiana's abortion ban under Article 1, Section 1 of the Indiana Constitution, which provides that "all people" are endowed "with certain inalienable rights," including "life, liberty, and the pursuit of happiness." The trial court entered a preliminary injunction on behalf of the medical-care providers. On the State's appeal from that injunction, our Supreme Court held that Article 1, Section 1 of the Indiana Constitution affirmatively "protects a woman's right to an abortion that is necessary to protect her life or to protect

---

[3] The Indiana Code defines "postfertilization age" to mean "the age of the fetus calculated from the date of the fertilization of the ovum." I.C. § 16-18-2-287.5. This is in contrast to the gestational age, which is commonly used by medical-care providers and is based on the number of weeks since a woman's last menstrual period. *See* Appellants' App. Vol. 2, p. 143 n.4. Fertilization typically occurs two weeks after a woman's last menstrual period, and, thus, the "postfertilization age" is typically two weeks shorter than the gestational age (*e.g.*, twenty-two weeks gestational age would be twenty weeks postfertilization age). *Id.*

her from a serious health risk," although the Court did not define "serious health risk" in the constitutional context. *Members of the Med. Licensing Bd. of Ind. v. Planned Parenthood Great Nw., Haw., Alaska, Ind., Ky., Inc.*, 211 N.E.3d 957, 962 (Ind. 2023) ("*Planned Parenthood I*"). And, that baseline aside, our Supreme Court held that our General Assembly "otherwise retains broad legislative discretion for determining whether and the extent to which to prohibit abortions." *Id.* Thus, in reviewing the trial court's entry of the preliminary injunction, our Supreme Court concluded that a *facial* challenge to the statute could not succeed but *as-applied* relief might be justified. *Id.* at 976-77. The Court therefore vacated the preliminary injunction and remanded for further proceedings. *Id.* at 985.

[4] On remand, the medical-care providers amended their complaint to request declaratory and injunctive relief on the theory that there are numerous, specific circumstances in which the life or health of a woman is at serious risk by a pregnancy, but the abortion ban would appear to prohibit a woman in those circumstances from obtaining an abortion to resolve those risks. The providers also challenged additional amendments to Indiana Code section 16-34-2-1 that now require all abortions to be performed in a licensed hospital or an ambulatory outpatient surgical center that is majority owned by a licensed hospital. *See* I.C. § 16-34-2-1(a)(1)(B), (a)(2)(C), (a)(3)(C) ("the Hospital Requirement"). The parties agreed to accelerate the proceedings on the amended complaint to a final hearing. After receiving significant amounts of

evidence, the trial court entered a final judgment denying the medical-care providers their requested relief.

[5] On appeal from that judgment, we hold as follows:

> 1. The constitutional right to an abortion under Article 1, Section 1 is limited to circumstances in which an abortion is the only reasonable medical option to protect a woman from a risk to her life or to protect her from a serious health risk. The circumstances argued by the medical-care providers here generally do not *necessitate* an abortion to treat those risks. Thus, the medical-care providers have not shown that their patients' constitutional abortion rights are available in circumstances that would not qualify them for a legal abortion under the statutory Life or Health Exception.

> 2. The constitutional right to an abortion under Article 1, Section 1 requires the determination that an abortion is necessary to be a reasonable medical judgment, which is consistent with the statutory Life or Health Exception. There is therefore no material burden on the constitutional right to an abortion under that statutory language.

> 3. Because the constitutional right to an abortion requires an extreme medical scenario where the woman's life or health is at serious risk, performing a constitutionally protected abortion in Indiana is a procedure that nearly always will be done in a hospital. Thus, the statutory Hospital Requirement is not a material burden on the constitutional right to an abortion.

[6] We affirm the trial court's judgment.

## Facts and Procedural History

This is the second round of trial and appellate proceedings between the parties regarding the validity of Indiana's abortion ban. The first round of proceedings is described below, followed by the proceedings on remand.

### The initial round of proceedings and *Planned Parenthood I*

Prior to the effective date of Indiana's abortion ban, the medical-care providers sought declaratory and injunctive relief to prohibit the enforcement of the statute. Following a hearing on the facial validity of the ban, the trial court entered a preliminary injunction in favor of the medical-care providers under Article 1, Section 1. The State appealed the trial court's injunction directly to our Supreme Court.

On appeal, our Supreme Court first held that the medical-care providers had standing to seek their requested relief because the abortion ban "criminalizes their work." *Planned Parenthood I*, 211 N.E.3d at 965. In reaching that initial conclusion, the Court rejected the State's assertion that the medical-care providers were simply attempting "to vindicate their patients' constitutional rights rather than their own." *Id.* And the Court noted that, in any event, it has "repeatedly reviewed the constitutionality of abortion laws based on abortion providers' claims that the laws are unconstitutional because they violate their patients' rights." *Id.* at 966 (citing cases).

The Court then held that, although written broadly, Article 1, Section 1 contains unenumerated and judicially enforceable rights. *Id.* The Court

explained that Article 1, Section 1 is a "Lockean Natural Rights Guarantee" that derives from our constitutional founders agreeing to "giv[e] up some natural rights . . . to better secure the remainder," which, in turn, implies that the founders did not "relinquish natural rights beyond what [wa]s reasonably necessary to secure the natural rights of the broader community." *Id.* at 968. Thus, the Court concluded that Article 1, Section 1 necessarily "include[s] unenumerated rights under the umbrella of 'life, liberty, and the pursuit of happiness,'" which rights the founders would have considered "beyond the reach of government." *Id.* at 968-69.

[11]    The Court also recognized that its understanding of Article 1, Section 1 displayed a "symmetry" between the unenumerated rights reserved to the people and the police power of the State:

> While the State worries judicial enforcement of unenumerated rights may overreach, most of the State's police powers are unenumerated too, so there should be equal concern that the State might view its own powers too generously. After all, our Constitution's language in delegating authority to the State for promoting the "peace, safety, and well-being" of Hoosiers is no less capacious than its language guaranteeing Hoosiers' rights to "life, liberty, and the pursuit of happiness." Ind. Const. art. 1, § 1. So, Article 1, Section 1 strikes a balance: it allows the State broad authority to promote the peace, safety, and well-being of Hoosiers, but that authority goes no farther than reasonably necessary to advance the police power, and not at the expense of alienating what Hoosiers have commonly understood to be certain fundamental rights.

*Id.* at 970.

The Court then applied its understanding of Article 1, Section 1 to abortion as follows:

> [The providers] emphasize that abortion procedures are sometimes their only means to save their patients' lives. That is undisputed, and we agree the Constitution—including Article 1, Section 1—does not permit the General Assembly to prohibit abortion in those circumstances. . . .
>
> Article 1, Section 1 expressly protects an "inalienable" right to "life," which was a firmly established right long before Indiana became a state. *See generally* Eugene Volokh, *State Constitutional Rights of Self-Defense and Defense of Property*, 11 Tex. Rev. L. & Pol. 399, 401-07 (2007). That right to protect one's own life extends beyond just protecting against imminent death, and it includes protecting against "great bodily harm." *Larkin v. State*, 173 N.E.3d 662, 670 (Ind. 2021). Although the State disputes that Article 1, Section 1 is judicially enforceable, it recognizes that governmental authority is limited to the police power, and it acknowledges "grave doubt" that the police power would permit the State to prohibit an abortion that was necessary to save a woman's life.
>
> Because this fundamental right of self-protection—whether considered as an exercise of the right to life, an exercise of the right to liberty, a limitation on the scope of the police power, or as a matter of equal treatment—is so firmly rooted in Indiana's history and traditions, it is a relatively uncontroversial legal proposition that the General Assembly cannot prohibit an abortion procedure that is necessary to protect a woman's life or to protect her from a serious health risk. *See, e.g.*, *Dobbs v. Jackson Women's Health Org.*, 597 U.S. [215], 142 S. Ct. 2228, 2305 n.2, 213 L. Ed. 2d 545 (2022) (Kavanaugh, J., concurring) ("Abortion statutes traditionally and currently provide for an exception when an abortion is necessary to protect the life of the mother."); *see*

*generally* Eugene Volokh, *Medical Self-Defense, Prohibited Experimental Therapies, and Payment for Organs*, 120 Harv. L. Rev. 1813, 1825 (2007) (demonstrating that, and explaining why, "the abortion-as-self-defense right is largely uncontroversial").

Reflecting that understanding, all of Indiana's abortion statutes since 1851 have recognized an exception for abortions that are required to protect a woman's life. Even when the General Assembly revised the abortion laws in response to *Roe [v. Wade]* and made clear it was not agreeing there is "a constitutional right to abortion on demand" or that it "approves of abortion," it also made clear that it continued to conclude that abortion should remain available "to save the life of the mother." Pub. L. No. 322, § 1, 1973 Ind. Acts 1740, 1740. And now that the United States Supreme Court has returned broad discretion to the states to determine the legality of abortion, [Indiana's] general abortion ban continues to recognize an exception for "when reasonable medical judgment dictates that performing the abortion is necessary to prevent any serious health risk to the pregnant woman or to save the pregnant woman's life." Ind. Code § 16-34-2-1(a)(1)(A)(i); *see also id.* § -1(a)(3)(A).

Accordingly, Article 1, Section 1 protects a woman's right to an abortion that is necessary to protect her life or to protect her from a serious health risk. . . .

*Id.* at 975-76 (record citation omitted).

[13] The Court then concluded that its holding under Article 1, Section 1 did not support the providers' claim for a preliminary injunction "because they framed their claim as a facial challenge to the entire statute in all conceivable circumstances rather than an as-applied challenge to the law's application in any particular set of circumstances where a pregnancy endangers a woman's life

or health." *Id.* at 976. Thus, the appeal in *Planned Parenthood I* did not "present an opportunity to establish the precise contours of a constitutionally required life or health exception and the extent to which that exception may be broader than the current statutory exceptions." *Id.* at 976-77. And the Court further held that our General Assembly retains legislative discretion to prohibit abortions that are unnecessary to protect a woman's life or to protect her from a serious health risk. *Id.* at 977. The Court therefore vacated the preliminary injunction and remanded for further proceedings. *Id.* at 984-85.

The medical-care providers petitioned our Supreme Court for rehearing, which the Court summarily denied. Chief Justice Rush, who had joined the majority in *Planned Parenthood I*, concurred in the denial of rehearing with opinion. She noted that Article 1, Section 1 "could protect a woman's right to obtain an abortion under circumstances that extend beyond the current law," but she concluded that rehearing was inappropriate because the providers had not "put [any such] concerns before us." *Members of Med. Licensing Bd. of Ind. v. Planned Parenthood Great Nw., Haw., Alaska, Ind., Ky., Inc.*, 214 N.E.3d 348, 349 (Ind. 2023) (Rush, C.J., concurring in the denial of reh'g).

**Proceedings on remand**

Following *Planned Parenthood I*, the medical-care providers[4] amended their complaint. In that complaint, the medical-care providers sought declaratory and

---

[4] There was some change in the named plaintiffs on remand, but those changes are immaterial to this appeal.

injunctive relief prohibiting the enforcement of the abortion ban in the following six circumstances where the medical-care providers argued Article 1, Section 1 would allow for an abortion but the abortion ban would appear to prohibit an abortion:

> (1) health conditions requiring treatment that would endanger the fetus, meaning that continuing the pregnancy could require forgoing needed treatment; (2) health conditions that cause extended and/or debilitating symptoms during the course of a pregnancy; (3) health conditions that are likely to worsen over the course of the pregnancy to eventually become life-threatening; . . . (4) health conditions that are likely to cause lasting damage to the patient's health or seriously increase the patient's future health risk, even after giving birth;

> . . . ([5]) mental health conditions treated with medications that do not have an established safety profile in pregnancy or that pose risks to the fetus, meaning that continuing the pregnancy could require forgoing needed treatment; and ([6]) severe and/or debilitating mental health conditions (including conditions that a patient has previously experienced and risk recurrence due to pregnancy)[.]

Appellants' App. Vol. 2, pp. 157-58.

[16] The medical-care providers likewise sought to enjoin the Hospital Requirement on the theory that it materially burdened their patients' rights under Article 1, Section 1 "by making abortion care prohibitively expensive and otherwise erecting insurmountable barriers to access for pregnant Hoosiers who are entitled to abortion care . . . ." *Id.* at 157. The medical-care providers alleged that, in 2021, the year before the abortion ban was enacted, "8,414 abortions

were performed in Indiana," with "[o]ver 98[%] of [them] . . . performed at [licensed] abortion clinics" that are now prohibited by the Hospital Requirement. *Id.* at 151-52. The medical-care providers further alleged that the Hospital Requirement would reduce the number of locations in Indiana where a woman could obtain an abortion to two Indianapolis hospitals. *Id.* at 152. Thus, as to the Hospital Requirement, the medical-care providers requested declaratory and injunctive relief allowing the operation of licensed abortion clinics "to provide abortions in the limited circumstances in which abortions are legal in Indiana." *Id.* at 158.

[17]  The parties agreed to accelerate the medical-care providers' claims to a final hearing on the merits. Following that evidentiary hearing, the trial court entered numerous undisputed findings of fact. Those findings of fact include the following undisputed findings with respect to the medical-care providers' claims that there are various physical-health conditions (the first four enumerated circumstances in paragraph 15 above) that might create a risk to the life or health of a woman and entitle her to an abortion under Article 1, Section 1 that the statutory abortion ban would appear to prohibit:

> 47. Hyperemesis gravidarum is a severe form of nausea and vomiting brought on by pregnancy. The most commonly cited diagnostic criteria for the disease are persistent vomiting not related to other causes, a measure of acute starvation . . . , and some discrete measure of weight loss, most often at least 5% of pre-pregnancy weight.

48. Hyperemesis gravidarum is the most common indication for admission to the hospital during the first part of pregnancy and is second only to preterm labor as the most common reason for hospitalization during pregnancy.

49. Hyperemesis gravidarum is typically confined to the first trimester but it can occasionally extend into the second trimester[] and rarely into the third trimester.

50. Hyperemesis gravidarum presents with different degrees of severity in different pregnant patients, and, although rare, it can become life-threatening. Some patients are unable to eat or drink for weeks, if not months, on end, severely limiting their nutritional intake. Severe hyperemesis can cause significant electrolyte abnormalities, cardiac arrhythmias and heart attack, kidney failure, liver damage, and even death.

51. Patients with hyperemesis gravidarum are at high risk of early delivery and are at risk of infections and blood clots.

52. The impact of hyperemesis gravidarum on women can be devastating[,] not only physically but also socially and emotionally. Although not typically life-threatening, patients with hyperemesis gravidarum may need to be admitted to hospitals for multiple days or weeks.

53. Treatments for hyperemesis gravidarum symptoms can vary significantly and can include nonpharmacologic options, pharmacotherapy, hospitalization, tube-feeding, and/or catheterization.

54. Given the significant range of clinical possibilities, it is possible that different patients suffering from hyperemesis gravidarum could qualify for a legal abortion under [Indiana

Code section 16-34-2-1], a constitutionally protected abortion under [Article 1, Section 1,] both, or neither.

55. Deep vein thrombosis is a condition in which potentially dangerous blood clots form in a patient's veins. The condition can have different levels of severity, including pulmonary failure and death from thromboembolism.

56. Pregnancy is a risk factor for deep vein thrombosis. As [one expert] testified . . . , "if you are predisposed to having deep vein thrombosis, being pregnant is going to put you at higher risk."

57. Doctors regularly expectantly manage a pregnant patient's deep vein thrombosis through anticoagulation medication (i.e., blood thinners). Most patients with deep vein thrombosis have mild disease that can be managed but a small subset of women suffer from severe embolic disease during pregnancy or in the postpartum period.

58. Neither induced abortion nor termination of pregnancy are mentioned as a management strategy for deep vein thrombosis in the American College of Obstetricians and Gynecologist's Practice Bulletin on Thromboembolism in Pregnancy.

59. Thromboembolic disease is potentially life threatening and accounts for 9% of pregnancy-related deaths.

60. Given the significant range of clinical possibilities, it is possible that different patients suffering from thromboembolic disease could qualify for a legal abortion under [Indiana Code section 16-34-2-1], a constitutionally protected abortion under [Article 1, Section 1,] both, or neither.

61. Preeclampsia is a disorder of pregnancy associated with new-onset hypertension, which occurs most often after twenty weeks gestation and frequently near term.

62. Preeclampsia presents with different degrees of severity in different women. If untreated, preeclampsia can develop into its more serious form, Hemolysis, Elevated Liver Enzymes and Low Platelets ("HELLP") syndrome and can cause organ damage, stroke, seizures, and death.

63. Preeclampsia is a progressive disease, and it can be difficult for physicians to predict when the risks presented by preeclampsia may become an emergency. Thus, it is consistent with best practices to manage preeclampsia as soon as it is detected, regardless of its severity at the time. Optimal management strategies for preeclampsia can be different depending on clinical maternal and fetal evaluation and gestational age.

64. Before 37 weeks [gestational age], doctors may try to manage preeclampsia symptoms by, for example, managing a pregnant person's blood pressure and monitoring for signs and symptoms of worsening disease.

65. Because preeclampsia is a progressive disease, the longer a patient remains pregnant, the worse the preeclampsia will get. As such, expectant management of preeclampsia is not always the safest option.

66. When preeclampsia occurs prior to viability, expectant management may not be recommended as a treatment option because it can pose a higher risk to the patient's health and the fetus may be unlikely to survive.

67. Because expectant management is intended to provide neonatal benefit at the expense of maternal risk, expectant management is not advised when neonatal survival is not anticipated.

68. The decision whether to manage a preeclamptic patient expectantly versus moving toward delivery is nuanced.

69. Given the significant range of clinical possibilities, it is possible that different patients suffering from preeclampsia could qualify for a legal abortion under [Indiana Code section 16-34-2-1], a constitutionally protected abortion under [Article 1, Section 1,] both, or neither.

70. Preterm premature rupture of the membranes ("PPROM") occurs when the sac (or amniotic membrane) surrounding the fetus ruptures before the pregnancy is full-term. It is a serious condition that places the pregnant woman at increased risk of infection, including "clinically evident intraamniotic infection," which occurs in 15-35% of cases. If the infection progresses to sepsis (infection in the bloodstream), the risk of severe morbidity (loss of fingers, toes, limbs, or neurologic injury), need for hysterectomy, or mortality becomes quite high.

71. PPROM occurs in approximately 2% to 3% of pregnancies in the United States.

72. Management decisions for PPROM depend on gestational age and evaluation of the relative risks of delivery versus the risks of expectant management when pregnancy is allowed to progress to a later gestational age. While expectant management is one option for patients with PPROM, it has significant maternal risks.

73. The risks of PPROM are especially difficult to manage in the mid-trimester—especially before 24 weeks [gestational age]—because the prognosis for the fetus if the pregnancy continues is usually poor, and, even in the best of circumstances, uncertain.

74. Delaying treatment when a patient has a mid-trimester PPROM can have grave consequences, including maternal sepsis and death.

75. IU Health and Eskenazi hospital systems have provided guidance to their physicians that performing abortion care in certain instances of PPROM fits within the [statutory Life or Health Exception] and abortions have been provided under these circumstances. [One medical expert] has treated patients with PPROM that were transferred from other hospitals that were unable or unwilling to provide abortion care.

76. Given the significant range of clinical possibilities, it is possible that different patients suffering from PPROM could qualify for a legal abortion under [Indiana Code section 16-34-2-1], a constitutionally protected abortion under [Article 1, Section 1,] both, or neither.

77. [The medical-care providers] present[ed] additional evidence regarding a range of other illnesses that they contend implicate constitutionally protected abortions that are prevented by [the statutory ban]. These include but were not limited to diabetes (gestational and preexisting), kidney disease, cancer, cardiovascular disease, molar pregnancy, auto-immune disorders, and obstructive sleep apnea.

78. Sometimes ending a pregnancy is necessary to protect a woman from a serious health risk or from a threat to her life. There are, however, "very, very few" conditions for which pregnancy is "contraindicated." And even for those conditions,

both sides' experts agree that abortion is not the only way to manage the condition . . . .

*Id.* at 63-70 (citations and internal alterations omitted).

[18] The trial court's findings of fact also include the following undisputed findings with respect to the medical-care providers' claims that there are various mental-health conditions (the last two enumerated circumstances in paragraph 15 above) that might create a risk to the life or health of a woman and entitle her to an abortion under Article 1, Section 1 that the statutory abortion ban would appear to prohibit:

> 82. Pregnancy is a complex and dynamic time that can impact mental health in a variety of ways, both biologically and psychosocially.
>
> 83. These biological and psychosocial factors can cause new mental health conditions to emerge in pregnant patients, can cause recurrences or exacerbations of previously experienced or current mental health conditions, and can force pregnant patients who take teratogenic medications to manage mental health conditions to face the decision to stop or adjust that medication or to change medications.
>
> 84. Pregnant patients may experience a range of severe and debilitating mental health conditions, including anxiety, depressive, and psychotic disorders. The specific symptoms and consequences of these conditions vary by both condition and between specific patients with similar diagnoses.

85. Pregnant patients experiencing severe anxiety disorders may be unable to work or care for themselves or their families and may require in-patient hospitalization.

86. Pregnant patients experiencing post-traumatic stress disorder ("PTSD") may suffer from nightmares, states of fear, and flashbacks, causing these patients to withdraw from daily life and relationships and possibly engage in self-harm.

87. Pregnant patients experiencing severe depressive disorder may be unable to function—for example, by being unable to eat or to care for themselves—and can suffer from escalating suicidal ideation, which increases the risk for self-harm and may require hospitalization.

88. Pregnant patients experiencing severe bipolar disorder can experience an exacerbation in the manic pole, causing the patient to become extremely agitated with excess energy, to feel decreased need for sleep, and to engage in very risky behavior that can evolve into psychosis and require psychiatric hospitalization. Pregnant patients with severe bipolar disorder may also experience an exacerbation of the depressive pole, the risks of which are similar to those for patients experiencing severe depressive disorder.

89. Pregnant patients experiencing severe schizophrenia can experience psychosis characterized by delusions, paranoia, and auditory hallucinations, which can tell the patient to do highly risky things, leadings to psychiatric hospitalization and/or increased medication for the patient's safety.

90. If the aforementioned mental health conditions go untreated, they can significantly worsen throughout pregnancy[] and can require psychiatric hospitalization.

91. Suicidal ideation, which can present alongside any of the aforementioned mental health conditions, can present as thoughts of ending one's life, developing active, specific plans to end one's life, and gathering means to end one's life.

92. Mental health conditions can also emerge or worsen during the postpartum period, which is a period complicated by many physiologic and biological changes, including abrupt hormonal changes, sleep disturbance, pain, recovery from delivery, and additional psychosocial changes.

* * *

99. Certain medications can pose developmental risks for an embryo or fetus. These teratogenic medications are sometimes used to manage mental health disorders during pregnancy. Teratogenic medications are not the only way to manage certain mental health conditions during pregnancy. Most doctors avoid teratogenic medications for women of childbearing age, whether or not they are pregnant.

100. Doctors routinely adjust patients' medications for a variety of reasons, and this can occur during pregnancy as well.

101. Due to ethical limitations on study design and the extreme difficulty in controlling for the innumerable confounding factors impacting a person's mental health, the scientific literature presented on the mental health impacts of abortion does not support definitive factual conclusions regarding abortion's mental health effects for a particular patient or class of patients.

102. The current scientific consensus is that abortion is not a direct treatment for mental health conditions.

103. The American College of Obstetricians and Gynecologists has asserted that it is impossible to create an inclusive list of what constitutes a medical emergency, and that creating a finite list is dangerous.

*Id.* at 70-75 (citations omitted).

[19] And, with respect to the medical-care providers' challenges to the Hospital Requirement, the trial court entered the following undisputed findings of fact:

105. Until [the abortion ban] went into effect, clinics performed the vast majority of abortions in Indiana, and they did so in accordance with State law and with minimal complications.

106. Complications from medically uncomplex abortion care are rare and can typically be treated in clinics.

107. Prior to [the abortion ban], clinics had policies and procedures to safely refer or transfer patients needing higher levels of care.

108. Before [the abortion ban] went into effect, and consistent with Indiana law, [Planned Parenthood] provided procedural abortions until 13 weeks and 6 days [gestational age] using oral medications and local pain medications, not anesthesia. Anesthesia is not required to provide abortion care, and, before [the abortion ban], patients needing anesthesia to complete a procedural abortion were transferred to hospitals as needed.

109. Because of the [new] legal limitations on abortions in Indiana, the likelihood that an abortion will be performed at a later gestational age and on a more medically complex patient has increased.

110. Hospitals and ambulatory surgical centers are better equipped than clinics to address complications arising from a constitutionally protected abortion implicating a serious health risk. "While clinics . . . may have plenty of staff who . . . know a lot about what . . . care they provide, they don't have the same type of emergency equipment that a . . . full-fledged hospital would have." For example, code carts, which have necessary equipment "for cardiopulmonary resuscitation," are "required in . . . a hospital," but not in a clinic. This is in part because ambulatory surgical centers and hospitals can perform "more complicated" procedures, including those requiring sedation or anesthesia.

111. Similarly, for an abortion in the case of a lethal fatal anomaly, hospitals are more likely than clinics to have genetic counseling, perinatal hospice and/or bereavement counseling services following abortion. And for abortions in the case of rape or incest, hospitals employ trained Sexual Assault Nurse Examiners who can investigate the circumstances leading to the abortion and help women avoid potentially abusive situations.

112. The cost difference between abortion treatment in a clinic versus a hospital is a significant one. . . .

* * *

115. Hospitals like IU Health and Eskenazi provide physicians with extensive guidance regarding compliance with Indiana abortion laws . . . . For example, IU Health provides its physicians with a document that has "frequently asked questions" regarding [the abortion ban and its exceptions]. IU Health has also put together a "rapid response team" to "deal with urgent provider questions regarding . . . termination of pregnancy" under the [statutory Life or Health Exception]. This team has "a clinical expert," "an ethical expert," and "a legal

expert," reachable by "a phone number you can call twenty-four seven." The hospital encourages physicians to consult its [abortion-ban] compliance resources and will defend its physicians against any legal action . . . if they follow the hospital's protocols. Though abortions have been performed there since [the abortion ban] went into effect, no civil or criminal actions have been brough[t] against an IU Health physician regarding whether an abortion was legally performed . . . .

*Id.* at 75-79 (citations and internal alterations omitted; some ellipses in original).

[20] The trial court then concluded that the medical-care providers' physical- and mental-health conditions did not identify a condition that would be protected by Article 1, Section 1 yet prohibited by Indiana Code section 16-34-2-1. Regarding the range of physical-health conditions, the court concluded that the medical-care providers "have not identified a specific situation in which [an] abortion would *both* fall outside [the statutory Life or Health Exception] *and* be 'necessary' to guard against" a patient's constitutionally protected interests. *Id.* at 85 (emphasis in original). Regarding the mental-health conditions, the trial court concluded that the medical-care providers "have not shown that there is a single mental health concern that *must* be treated with abortion." *Id.* at 86 (emphasis added). And, with respect to the Hospital Requirement, the court concluded that "the evidence demonstrates that many women receiving abortion care when they are seriously ill or at risk of becoming seriously ill will likely be receiving in-hospital care irrespective of the Hospital Requirement," and, further, increased costs and travel are insufficient under Indiana law to

demonstrate a material burden of a constitutional right.[5] *Id.* at 93-94. Accordingly, the trial court denied the medical-care providers their requested relief.

This appeal ensued.

## Standards of Review

The medical-care providers appeal the trial court's entry of a final judgment supported by findings of fact and conclusions thereon following an evidentiary hearing.[6] In such appeals, we review the trial court's judgment under our clearly erroneous standard. *E.g.*, *Town of Linden v. Birge*, 204 N.E.3d 229, 233-34 (Ind. 2023). Under that standard, we "determin[e] whether the evidence supports the findings and, if so, whether the findings support the judgment." *Id.* at 233. We

---

[5] The medical-care providers do not challenge the trial court's assessment that Indiana law does not permit increased costs to demonstrate a material burden of a constitutional right. *See Clinic for Women, Inc. v. Brizzi*, 837 N.E.2d 973, 981 (Ind. 2005) ("a law . . . does not violate the Constitution solely because it directly or indirectly results in economic hardship") (quotation marks omitted).

[6] The parties dispute whether the trial court actually assessed the medical-care providers' claims under an as-applied standard and whether the trial court could have construed their claims as facial challenges. We conclude that the trial court plainly and correctly considered the medical-care providers' claims under an as-applied standard.

    The State also suggests that the medical-care providers lack standing to present their challenges to the abortion ban because they have not identified by name any patients in present need of abortion care. But the State's suggestion is directly contrary to our Supreme Court's holding in *Planned Parenthood I* that the medical-care providers have standing to challenge Indiana's abortion laws both in their own right and derivatively on behalf of their patients. 211 N.E.3d at 965-66. We reject the State's position accordingly. We further note that the State's corollary assertion that the medical-care providers' claims are not ripe for review for the same reason—*i.e.*, that there is no named patient in imminent need of care—is an understanding of ripeness that is unreasonable under Indiana law and, in the context of emergency medical care, invites mootness issues. *Cf. K.E. v. Ind. Dep't of Child Servs.*, 39 N.E.3d 641, 649 (Ind. 2015) (noting that our trial courts need not wait until an irreversible impairment occurs before acting). We therefore also reject those arguments.

will not reweigh the evidence or reassess the credibility of the witnesses. *Id.* at 234.

[23] That said, the parties do not dispute the trial court's findings, and, thus, the issues argued in this appeal all are questions of law surrounding the meaning or application of constitutional and statutory provisions. Our review of such issues is de novo, and we owe no deference to the trial court's assessment of what the law is. *See, e.g.*, *Russell v. State*, 234 N.E.3d 829, 857 (Ind. 2024). "A statute challenged under the Indiana Constitution stands before this Court clothed with the presumption of constitutionality until clearly overcome by a contrary showing." *Planned Parenthood I*, 211 N.E.3d at 975 (quotation marks omitted). Further, when construing a statute, our "primary task is to give effect to the intent of the legislature" by giving the statute's words their "plain meaning" and by considering "the structure of the statute as a whole." *Nardi v. King*, 253 N.E.3d 1098, 1104 (Ind. 2025) (quotation marks omitted).

## 1. The right to an abortion that is protected under Article 1, Section 1 requires the abortion to be a necessary procedure to protect the woman's life or to protect her from a serious health risk.

[24] On appeal, we first address the medical-care providers' arguments that the trial court's judgment is clearly erroneous on their theory that the undisputed findings demonstrate numerous circumstances in which an abortion would resolve a serious health risk to the mother but the statutory ban would appear to prohibit such an abortion. The medical-care providers frame these arguments as

falling within a legal space where the constitutional definition of a "serious health risk" is greater than the statutory definition. *See* Appellants' Br. at 37-38. The medical-care providers' arguments are especially notable with respect to mental-health conditions, which are expressly excluded under the definitions relevant to the statutory Life or Health Exception. *See* I.C. § 16-18-2-327.9.

[25] But whether there is a conceptual gap between the constitutional understanding of a "serious health risk" and the statutory definition of it is beside the point on this record. The constitutional right to an abortion is limited to circumstances in which an abortion is "necessary" to protect the life of the woman or to protect her from a serious health risk. *Planned Parenthood I*, 211 N.E.3d at 975-76. "[O]therwise," our General Assembly "retains broad legislative discretion for determining whether and the extent to which to prohibit abortions." *Id.* at 962. Stated another way, if both an abortion and a reasonable medical alternative to an abortion exist to treat a given condition, the patient's constitutional right to an abortion is not available. *See id.* at 975-76.

[26] And here the record demonstrates that all of the physical-health conditions identified by the medical-care providers can be treated by reasonable medical means *other than* an abortion up until a given condition becomes so extreme that an abortion is necessary to either save the woman's life or to prevent a serious risk to her of organ damage. And once one of those extreme scenarios is met, an abortion becomes legal both under Article 1, Section 1 and under the statutory Life and Health Exception. *See id.*; *see also* I.C. § 16-43-2-1. Similarly, the record here demonstrates that the medical-care providers' identified mental-

health conditions can also be treated by reasonable medical alternatives to abortions.

[27] We acknowledge that the physical- and mental-health conditions identified by the medical-care providers all demonstrate some measure of a "serious health risk" as that phrase might be used colloquially, regardless of whether those risks are within our statutory or constitutional uses of the phrase. And we acknowledge the medical-care providers' concerns that our Supreme Court's articulation of the right to an abortion under Article 1, Section 1 might "compel[] physicians to wait until a patient's condition is desperate before performing an abortion." Appellants' Br. at 37. But that is the balance struck between the unenumerated, reserved right to the people under Article 1, Section 1 and the State's police power under the Indiana Constitution. *See Planned Parenthood I*, 211 N.E.3d at 970. Accordingly, the trial court did not err when it concluded that the physical- and mental-health conditions identified by the medical-care providers fail to show a scenario where the right to an abortion is available under Article 1, Section 1 but prohibited by the statutory abortion ban.

## 2. The constitutional right to an abortion under Article 1, Section 1 requires the determination that an abortion is necessary to be a reasonable medical judgment, which is consistent with the statutory Life or Health Exception.

[28] The medical-care providers next contend that the Life or Health Exception imposes a material burden on the constitutional right to an abortion by

requiring an invocation of the statutory exception to be based on a "reasonable medical judgment." Appellants' Br. at 42-43. Under our Supreme Court's precedents, a constitutional right "is impermissibly alienated when the State materially burdens one of the core values which it embodies." *Clinic for Women, Inc. v. Brizzi*, 837 N.E.2d 973, 983 (Ind. 2005) (quotation marks omitted). This analysis looks to whether "the right, as impaired, would no longer serve the purpose for which it was designed . . . ." *Id.*

[29] The medical-care providers argue that "[t]he 'reasonable medical judgment' standard" under the statutory Life or Health Exception "is tethered to such narrow and ambiguous circumstances that physicians are hesitant to rely on it." Appellants' Br. at 43. The medical-care providers further assert that "physicians using their reasonable medical judgment can, and often do, reach different conclusions on proposed treatments," and the fear of prosecution for performing an abortion has had a chilling effect on physicians who might have otherwise done so. *Id.*

[30] We acknowledge that the fear of prosecution is real and potentially chilling to medical-care providers. However, we reject the medical-care providers' suggestion that the "reasonable medical judgment" standard is amorphous simply because reasonable physicians can come to different judgments as to the best course of care to provide to a patient. That reasonable minds may differ is typically a basis for leeway in how one might proceed and is not a basis for strict compliance to a singular approach in all circumstances.

That said, we discern no impairment of the constitutional right to an abortion by the statutory "reasonable medical judgment" standard. As explained above, the constitutional right to an abortion is available only where that procedure is "necessary" to protect the life of the woman or to protect her from a serious health risk. *Planned Parenthood I*, 211 N.E.3d at 975-76. Those circumstances are medical circumstances and determining whether they exist requires a reasonable medical judgment. The statutory Life or Health Exception thus does not impose a material burden on the constitutional right to an abortion at all as both the constitutional right and the statutory exception require a reasonable medical judgment.

## 3. The statutory Hospital Requirement also does not impair the constitutional right to an abortion.

The final issue in this appeal is the medical-care providers' challenge to the Hospital Requirement. Specifically, the medical-care providers argue that the Hospital Requirement has substantially reduced access to abortion care throughout the State and made it exceedingly more difficult for women who might need such care to protect their lives or to protect themselves from serious health risks.

We do not agree that the Hospital Requirement specifically, rather than the statutory ban itself, is to blame for the reduced access to abortion care in Indiana. And, the medical-care providers' assertions aside, the Hospital Requirement does not impair the constitutional right to an abortion. A woman in need of exercising her constitutional right to an abortion is, by definition,

facing a risk to her life or a serious health risk. *Planned Parenthood I*, 211 N.E.3d at 975-76. As the trial court expressly found, a woman facing such a substantial medical risk "will likely be receiving in-hospital care" with or without the Hospital Requirement. Appellants' App. Vol. 2, p. 93. Thus, the medical-care providers cannot show that the Hospital Requirement imposes a material burden on the constitutional right to an abortion.

## Conclusion

For all of these reasons, we affirm the trial court's denial of the medical-care providers' claims for declaratory and injunctive relief.

Affirmed.


Altice, C.J., and DeBoer, J., concur.

ATTORNEYS FOR APPELLANTS

Kenneth J. Falk
Gavin M. Rose
Stevie J. Pactor
ACLU of Indiana
Indianapolis, Indiana

Catherine Peyton Humphreville
Melissa Shube
Planned Parenthood Federation of America
New York, New York

Rupali Sharma
Lawyering Project
South Portland, Maine

Allison Zimmer
Lawyering Project
New Orleans, Louisiana

Katherine V. Mackey
Wilmer Cutler Pickering Hale and Dorr LLP
Boston, Massachusetts

Alan E. Schoenfeld
Lori A. Martin
Wilmer Cutler Pickering Hale and Dorr LLP
New York, New York


ATTORNEYS FOR APPELLEES

Theodore E. Rokita
Attorney General of Indiana

James A. Barta
Solicitor General

Jenna M. Lorence
Deputy Solicitor General

Katelyn E. Doering
John M. Vastag
Deputy Attorneys General
Indianapolis, Indiana